[No. D030553. Fourth Dist., Div. One. Dec. 27, 1999.]

ARLEEN FREEMAN et al., Plaintiffs and Appellants, v.
SAN DIEGO ASSOCIATION OF REALTORS et al., Defendants and
Respondents.

174

**COUNSEL**

Barry & Associates and David Barry for Plaintiffs and Appellants.

Luce, Forward, Hamilton & Scripps, Charles A. Bird, Christopher J. Healey, John T. Brooks; White and Bright, David S. Bright, Michael A. Friedrichs; Musick, Peeler & Garrett, William McD. Miller III, Michael J. Hickman and Jon F. McKinley for Defendants and Respondents.

**OPINION**

**McDONALD, J.**—Defendant Sandicor, Inc. (Sandicor) operates a real estate sales multiple listing service (MLS) covering San Diego County. Real estate agents pay a monthly fee to access Sandicor's MLS listings. Plaintiff real estate agent Arleen Freeman filed this action, alleging that defendants Sandicor, San Diego Association of Realtors (SDAR) and several other real

estate associations and individuals (collectively defendants)[1] violated California's antitrust laws[2] by charging excessive fees for access to Sandicor's MLS (the price fixing, tying and market exclusion claims) and refusing Freeman's request to become a service center for Sandicor (the group boycott claim). Freeman's lawsuit also asserted the excessive charges for MLS access violated an extant permanent injunction and entitled Freeman to damages. The trial court sustained defendants' demurrers to Freeman's third amended complaint and dismissed the action. Freeman timely filed a notice of appeal.

We evaluate whether the facts alleged by Freeman state causes of action against defendants.

## I

### FACTUAL BACKGROUND[3]

#### A. *The MLS*

The MLS is a computerized medium by which real estate agents exchange information on properties that are for sale or have been

---

[1]Freeman alleged that SDAR and four other realtor associations (collectively, the local associations), the shareholders of Sandicor and operators of the service centers (see *post*, at pt. I.D), participated in agreements and actions that violate the California antitrust laws. Freeman also alleged that various individuals were directors of either Sandicor or one of the local associations (the director defendants) and that the director defendants were personally liable as independent participants in the alleged antitrust violations.

[2]Business and Professions Code section 16700 et seq., hereinafter the Cartwright Act.

[3]Our factual statement is drawn from the facts alleged in Freeman's third amended complaint as modified or amplified by facts that may be judicially noticed. When examining the sufficiency of a complaint against a general demurrer, we treat as true all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479, 16 A.L.R.5th 903].) However, we disregard allegations that are contrary to law or to facts that may be judicially noticed (*Fundin v. Chicago Pneumatic Tool Co.* (1984) 152 Cal.App.3d 951, 955 [199 Cal.Rptr. 789]) or are contradicted by the express terms of an exhibit incorporated into the complaint. (*Alphonzo E. Bell Corp. v. Bell etc. Synd.* (1941) 46 Cal.App.2d 684, 691 [116 P.2d 786].) Because the operative pleading was Freeman's fourth iteration of her claims, she may not avoid defects of her earlier pleadings by omitting facts that made the earlier pleadings defective or alleging new facts inconsistent with the allegations of the earlier pleadings. (*Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 383-384 [243 Cal.Rptr. 627] [when plaintiff pleads inconsistent facts without explaining the inconsistency the court will read into the amended complaint the facts alleged in the superseded complaint].) Moreover, when affidavits or exhibits filed by a plaintiff may be judicially noticed, the court may consider those facts to assess whether the complaint survives a general demurrer. (*Dwan v. Dixon* (1963) 216 Cal.App.2d 260, 264-265 [30 Cal.Rptr. 749] [allegation of complaint that defendant put plaintiff in the car and aided and assisted him to drive disregarded because plaintiff's affidavit in action showed defendant did not put plaintiff in the car or aid or assist him to drive]; *Hill Trans. Co. v. Southwest Forest Industries, Inc.* (1968) 266 Cal.App.2d 702, 710-711 [72 Cal.Rptr. 441] [court may consider exhibits to superseded pleading].)

recently sold. Real estate agents who have listings to sell properties may submit information to the MLS to advertise the properties for sale, and real estate agents seeking properties for buyers can use the MLS to search for properties that meet the buyer's criteria for location, size, price and other characteristics.

### B. *Palsson, NAR I* and *NAR II*

Because Freeman's claims are based in substantial part on prior legal decisions that concluded certain MLS practices violated antitrust laws, we summarize those decisions.

In *Marin County Bd. of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920 [130 Cal.Rptr. 1, 549 P.2d 833] (hereafter *Palsson*) a realtors' association operated the only MLS for Marin County. The association permitted only members of the association to use the MLS and denied membership to persons who were only part-time real estate agents. *Palsson* concluded that denial of MLS access to nonmembers constituted a restraint of trade, and that the restrictions on access and membership did not pass the "rule of reason" test. (*Id.* at pp. 934-940.) *Palsson* ordered that the "rules denying access of nonmembers to the [MLS] must be eliminated, although nonmembers may be charged a reasonable fee for use of the service consistent with the per-capita costs of operation." (*Id.* at p. 940.)

In *People v. National Association of Realtors* (1981) 120 Cal.App.3d 459 [174 Cal.Rptr. 728, 22 A.L.R.4th 79] (hereafter *NAR I*) this court concluded that certain policies of SDAR[4] violated California's antitrust laws. *NAR I* held: (1) SDAR's rule that limited access to its residential MLS to SDAR members was an unlawful group boycott (*id.* at pp. 467-468); (2) SDAR's rule permitting only "exclusive right to sell" listings on the MLS was an unlawful restraint on trade (*id.* at pp. 477-479); and (3) certain SDAR policies and practices facilitated price fixing of brokers' commissions (*id.* at pp. 479-487). *NAR I* remanded the case to the trial court with directions to issue an injunction "as generally contained in [paragraph 1(a) of] the prayer of the second amended complaint . . . ."[5] (120 Cal.App.3d at p. 488.)

---

[4]At that time, SDAR was called San Diego Board of Realtors.

[5]The precise contours of the injunction are not included in the record. However, *People v. National Association of Realtors* (1984) 155 Cal.App.3d 578, at page 582, footnote 2 [202 Cal.Rptr. 243] (hereafter *NAR II*) recited that paragraph 1(a) of the prayer of the second amended complaint sought to enjoin SDAR from " 'refusing access to any licensed [real estate agents] to the [MLS] . . . or from imposing costs to any such [real estate agents] for the listing or use of such a service beyond the cost of providing the service itself. . . .' "

In *NAR I* the court also opined that SDAR's rule limiting access to its investment property MLS to SDAR members could constitute an unlawful tying arrangement and on remand directed the trial court to make a factual determination whether SDAR held sufficient economic power over the tying product (the investment property MLS) to restrain trade in the tied product (association membership). (120 Cal.App.3d at pp. 469-473.) On remand, the trial court found no unlawful tying arrangement. However, in the subsequent appeal this court in *NAR II* concluded that conditioning access to the investment property MLS on membership in SDAR was an unlawful tying arrangement. In *NAR II* we ordered that the injunction be modified to permit access to the investment property MLS on the same terms as access to the residential MLS. (155 Cal.App.3d at p. 589.)

On remand of *NAR II*, the trial court issued its 1984 injunction ordering that access to SDAR's residential MLS and investment property MLS be available on a equal footing to all licensed real estate agents without regard to SDAR membership. The injunction permitted SDAR to impose reasonable charges for access to each MLS, including an allocation of overhead costs of operating the MLS, provided that charges to members and nonmembers were made on the same basis.

### C. *The Creation of Sandicor*

Prior to 1992 there were 11 regional associations of real estate agents in San Diego County. These associations operated three separate MLS's, each of which provided a partial and fragmented listing of the real estate for sale in San Diego County.

In December 1991 the local associations combined their separate MLS's and created a new product: a single, countywide MLS listing all properties for sale throughout San Diego County. To create this new product, the local associations formed Sandicor, a corporate entity in which they were shareholders.[6] Sandicor owns and operates a countywide MLS. Sandicor's MLS is an essential tool for real estate agents, and nearly all real estate agents actively engaged in buying or selling real estate in San Diego County use Sandicor's MLS.

---

[6] Freeman asserts Sandicor's separate existence should be disregarded because it is a sham corporation, and that Sandicor should instead be treated as a partnership of the constituent associations.

Real estate agents pay Sandicor a uniform monthly fee set by Sandicor to use Sandicor's MLS. The monthly fee is used to pay the costs of operating the MLS and Sandicor's service centers (see, *post* at pt. D).[7]

### D. *The Alleged Tying Arrangement: The Enhanced Services*

Some local associations have contracted with Sandicor to act as service centers to perform services for Sandicor and its MLS subscribers that Freeman denominates as "Enhanced Services." Enhanced Services performed by the service centers include: processing enrollment forms and collecting enrollment fees for subscribers to Sandicor's MLS and maintaining records on these participants; billing and collecting monthly fees from subscribers and remitting fees to Sandicor; inputting MLS listings into Sandicor's MLS database when requested by a subscriber; monitoring listings for compliance with Sandicor's rules; providing forms for Sandicor's MLS complaints and forwarding complaints to Sandicor; distributing MLS books to subscribers; stocking and distributing Sandicor property data profile sheets and other Sandicor forms and supplies; providing staff to answer questions by subscribers; providing meeting facilities on request by Sandicor; processing reciprocal listings on properties within the local association's jurisdiction from subscribers to other MLS's that have reciprocity agreements with Sandicor; and, when a Sandicor subscriber has a listing on a property outside Sandicor's jurisdiction but within the jurisdiction of another MLS with which Sandicor has a reciprocity agreement, to process that listing with the other MLS.

Freeman alleged that these Enhanced Services, although forming a portion of the benefits available to Sandicor's MLS subscribers, augmented and supplemented the MLS but were unnecessary to the use of the MLS; they were instead distinct and separate services. Freeman also alleged that the Enhanced Services were almost entirely worthless to subscribers; that subscribers would not have purchased these services if given the choice; and that the subscribers paid for the Enhanced Services only because Sandicor would not sell access to the MLS separately from the Enhanced Services.

Freeman's tying claim alleged: Sandicor conditioned sale of access to its MLS (the tying product) on purchase of the Enhanced Services (the tied

---

[7]Although Freeman's third amended complaint alleged real estate agents pay a monthly fee to Sandicor for MLS access and a separate monthly fee to the local associations for "Enhanced Services," her second amended complaint (as well as the exhibits filed by Freeman in support of her motion for class certification) alleged that real estate agents pay their monthly fee to Sandicor. A portion of that fee is retained by Sandicor to pay the direct costs of operating the MLS computer system, and the other portion of that fee is used by Sandicor to pay the local associations that have contracted with Sandicor to act as service centers for subscribers to Sandicor's MLS.

product); Sandicor had sufficient economic power to force real estate agents wishing to purchase MLS access to also purchase the Enhanced Services; and a not insubstantial amount of sales in the tied product was effected by the tying arrangement.

### E. *The Alleged Price Fixing*

Freeman alleged Sandicor's corporate form was a sham that should be disregarded and treated instead as a partnership of the local associations. Based on this premise, Freeman alleged the local associations were separate entities holding competing economic interests and each agreed with the others to eliminate price competition for Sandicor's MLS by fixing the price for the MLS and Enhanced Services at a uniform rate.

### F. *The Alleged Market Exclusion*

Freeman alleged Sandicor's fee for access to its MLS is excessive and violates the antitrust laws by excluding brokers who cannot afford to subscribe; as a result trade is restrained by limiting the number of competing brokers.

### G. *The Alleged Group Boycott*

Several months after Freeman filed this class action lawsuit, Freeman asked Sandicor to appoint her to act as a service center. She promised to provide the MLS and Enhanced Services to her customers at rates lower than those charged by the other service centers. Sandicor refused to appoint her as a service center. Freeman alleged the local associations combined to cause Sandicor to refuse Freeman's request, and the combined action constituted a group boycott of Freeman.

### H. *Violation of the Injunction*

Freeman alleged that the 1984 injunction resulting from our decision in *NAR II* required SDAR to charge only a reasonable amount for access to the MLS, and that by including charges for Enhanced Services that were worthless to Freeman the charge imposed for access to Sandicor's MLS exceeded the amount permitted under the injunction.

## II

### PROCEDURAL HISTORY

All defendants demurred to Freeman's third amended complaint. The trial court sustained the demurrers of Sandicor and the local associations in part

because the complaint did not allege facts sufficient to show the defendants had separate and distinct interests with respect to the conduct alleged or that there were separate products or services that had been tied together. The court granted Freeman leave to amend to cure these defects.[8] Freeman elected not to amend, and the court dismissed the complaint.

### III

### ANALYSIS OF ANTITRUST CLAIMS[9]

#### A. *The Complaint Did Not State an Illegal Tying Claim*

██ The complaint alleged that packaging Enhanced Services with access to the MLS data as a single product, and refusing to sell access to the MLS data separately from the Enhanced Services, constituted an unlawful tying arrangement in violation of the Cartwright Act. ██ ■ ■
██ The demurrers argued that because the complaint on its face showed the Enhanced Services and the MLS data constituted a single unitary service rather than normally separate services, the complaint did not state a tying claim.[10]

#### 1. *Applicable Principles*

██ A tying arrangement under antitrust laws exists when a party agrees to sell one product (the tying product) on the condition that the buyer also purchases a different product (the tied product), thereby curbing competition in the sale of the tied product. (*Northern Pac. R. Co. v. United States* (1958)

---

[8]The court sustained the demurrers of the director defendants without leave to amend because it concluded that the complaint did not adequately allege specific overt acts in furtherance of the conspiracy as required by *Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305 [70 Cal.Rptr. 849, 444 P.2d 481]. Because we conclude the trial court correctly sustained the demurrers of Sandicor and the local associations to Freeman's complaint, and Freeman makes no argument that her claims against the director-defendants survive dismissal of her other antitrust claims, it is unnecessary separately to evaluate the claims against the director-defendants.

[9]In analyzing Freeman's Cartwright Act claims we frequently examine federal precedent because the Cartwright Act is similar in language and purpose to the Sherman Act. (*Saxer v. Philip Morris, Inc.* (1975) 54 Cal.App.3d 7, 19 [126 Cal.Rptr. 327].) However, federal precedents must be used with caution because the acts, although similar, are not coextensive. (*State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147, 1152-1169 [252 Cal.Rptr. 221, 762 P.2d 385].)

[10]SDAR also argued that because Freeman's complaint affirmatively alleged the local associations were the only parties benefiting from sale of the Enhanced Services, the complaint was fatally defective because a tying claim requires the party selling the tying product have a financial interest in the sale of the tied product. SDAR does not resurrect this argument on appeal.

356 U.S. 1, 5-6 [78 S.Ct. 514, 518-519, 2 L.Ed.2d 545].) Antitrust laws against tying arrangements seek to eradicate the evils that (1) competitors are denied free access to the market for the tied product not because the seller imposing the tying requirement has a better or less expensive tied product, but because of the seller's power or leverage in the market for the tying product; and (2) buyers are forced to forgo their free choice between competing tied products. (*Ibid.*) Tying arrangements are illegal per se "whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product" (*id.* at p. 6 [78 S.Ct. at p. 518]), and when "a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie . . . ." (*Fortner Enterprises v. U.S. Steel* (1969) 394 U.S. 495, 501 [89 S.Ct. 1252, 1258, 22 L.Ed.2d 495].)

■ The threshold element for a tying claim is the existence of separate products or services in separate markets. (*Jefferson Parish Hospital Dist. No. 2 v. Hyde* (1984) 466 U.S. 2, 21 [104 S.Ct. 1551, 1562-1563, 80 L.Ed.2d 2].) Absent separate products in separate markets, the alleged tying and tied products are in reality a single product. (*Hirsh v. Martindale-Hubbell, Inc.* (9th Cir. 1982) 674 F.2d 1343, 1350.)

Assuming that separate products in separate markets exist, a plaintiff claiming an illegal tying arrangement must plead: "(1) a tying agreement, arrangement or condition existed whereby the sale of the tying product was linked to the sale of the tied product; (2) the party had sufficient economic power in the tying market to coerce the purchase of the tied product; and (3) a substantial amount of sale was effected in the tied product." (*Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 542 [161 Cal.Rptr. 811].)

### 2. *Analysis*

■ We conclude Freeman's complaint, read in the context of the facts of which we may take judicial notice, and shorn of its conclusory allegations,[11] did not adequately allege an illegal tying arrangement. The alleged facts do not demonstrate that (1) access to Sandicor's MLS data and the

---

[11]The complaint did allege the raw MLS data and the Enhanced Services were separate products and that the total yearly amount of sales of the Enhanced Services was "not insubstantial." Freeman argues that on demurrer the court must accept these allegations as true. Although a court must on demurrer accept as true properly pleaded facts, a demurrer does not admit contentions or conclusions of law or fact. (*Chicago Title Ins. Co. v. Great Western Financial Corp., supra,* 69 Cal.2d at p. 327.) The plaintiff must allege facts that, if proven, demonstrate the products occupy separate markets, and conclusory allegations of

Enhanced Services are separate products for which separate markets exist, or that (2) the tie affected a substantial volume of commerce in the market for the tied product.

The complaint alleged, and in opposition to the demurrers Freeman argued, the Enhanced Services as a whole constituted the separate tied product, and that the tie involved a "not insubstantial amount of sales in terms of the total dollar value of 'Enhanced Services.'"

On appeal, however, Freeman shifts her theory to argue that each component part of the Enhanced Services must be severally evaluated to assess the viability of her tying claim. She concedes that many components of the Enhanced Services do not comprise a service severable from access to the MLS, and has abandoned her claim of an illegal tie as to those components.[12] However, she argues her tying claim for other components of the Enhanced Services remains viable. We examine whether each remaining component satisfies the legal requirements for separateness and substantial affect.

*Distribution of MLS Books*: Freeman argues that sale of a product and sale of a delivery service are severable services for a tying claim (see *Anderson Foreign Motors v. New England Toyota, etc.* (D.Mass. 1979) 475 F.Supp. 973), and that because Sandicor's delivery service competes with third party delivery services like the postal service and United Parcel Service there exists an unlawful tying arrangement. This claim is unpersuasive. Although the complaint alleged that one component of the Enhanced Services is

"separateness" are insufficient. (*Lee v. Life Ins. Co. of North America* (D.R.I. 1993) 829 F.Supp. 529, 537 [Sherman Act tying claim dismissed at pleading stage where complaint contained conclusory allegation of "separateness"]; *Nordic Bank PLC v. Trend Group, Ltd.* (S.D.N.Y. 1985) 619 F.Supp. 542, 568 [same].) Freeman urges that *Corwin v. Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842 [94 Cal.Rptr. 785, 484 P.2d 953] held that separateness is always a question to be resolved by the trier of fact and it is therefore improper to resolve the issue at the pleading stage. However, *Corwin* held only that triable issues of fact on the issue of separateness were present in that case (*id.* at pp. 855-859) but did not hold that the question of separateness can never be resolved as a matter of law. Indeed, *Corwin*'s discussion of this issue relied on *Times-Picayune v. United States* (1953) 345 U.S. 594 [73 S.Ct. 872, 97 L.Ed. 1277], in which the court determined as a matter of law the products were not separate. (*Id.* at pp. 613-615 [73 S.Ct. at pp. 883-884].) *Corwin* does not stand for the broad proposition urged by Freeman. Because the courts have resolved the issue of separateness as a matter of law under appropriate circumstances (see *Wells Real Estate v. Greater Lowell Bd. of Realtors* (1st Cir. 1988) 850 F.2d 803, 814-815), "separateness" is not invariably a factual issue insulating the complaint from scrutiny on demurrer.

[12]Freeman concedes on appeal that processing enrollment forms and collecting enrollment fees for subscribers, maintaining records on subscribers, billing and collecting monthly fees from subscribers and remitting them to Sandicor, and providing staff to answer questions by subscribers are integral and not separate components of the MLS.

distribution of MLS books, the complaint did not allege that Sandicor uses an in-house delivery service that excludes third party delivery services; to the contrary, the complaint admitted outside vendors are used for delivery of MLS books.[13] Of equal import, Freeman affirmatively alleged that MLS books do not exist, and did not exist for more than a year before her complaint was filed. This allegation raises an insurmountable obstacle to her tying claim. A plaintiff must allege the tie affected a substantial volume of commerce in the market for the tied services. It is conceptually impossible that there is a market for a nonexistent service (here, delivery of nonexistent books) that was substantially injured by Sandicor's nonexistent distribution service.

*Stocking and Distributing Sandicor Forms*: Freeman argues that conditioning MLS access on Freeman's payment for Sandicor's property data profile sheets and other Sandicor forms creates an illegal tie.[14] This claim is unpersuasive. First, to the extent that Sandicor's property data profile sheets were tailored to track the format of its MLS data service, they cannot be characterized as a product separate from the MLS data service. Second, although the complaint alleged local associations stocked and distributed these forms, Freeman did not allege that she was required as a condition to MLS access to purchase or use these forms from Sandicor in lieu of using forms available from competitors.[15] Even had Freeman made that allegation, however, the complaint omitted any allegation that the availability of these forms from Sandicor caused a substantial economic detriment to the market for forms sold by Sandicor's competitors. Freeman's complaint, insofar as it relied on the tying of forms, did not state a tying claim.

*Inputting Listings:* Freeman argues that tying sale of MLS access to payment for use of a local service center to input listings into the MLS database is an unlawful tying arrangement. This claim is unpersuasive. First, the complaint did not allege this service occupies a market separate from

---

[13]The actual provisions of the service contract between Sandicor and the local associations, which control over inconsistent allegations for purposes of demurrer (*C & H Foods Co. v. Hartford Ins. Co.* (1984) 163 Cal.App.3d 1055, 1064 [211 Cal.Rptr. 765]), provide that delivery charges would be "[a]s charged by delivery service."

[14]She makes a similar allegation regarding Sandicor's complaint forms. However, Freeman does not allege (even in a conclusory fashion) that complaint forms are available elsewhere, making her claim defective. She cannot show that Sandicor's furnishing of complaint forms injured competitors in the complaint form market.

[15]A separate defect in Freeman's tying claim is that the complaint alleged the forms were "Sandicor property profile data forms," and although the complaint vaguely alleged that some type of forms were "available from other sources" it did not allege that Sandicor's proprietary forms were available elsewhere or that the tying arrangement injured competition in the "Sandicor property profile data forms" market.

MLS access.[16] Second, because the complaint did not allege anyone competes to sell this service and instead affirmatively alleged that most agents input their own listings and do not use this service, the complaint was defective by not alleging that the tie caused substantial economic detriment to competitors who are attempting to sell this service.

*Reciprocal Placement of Listings:* When Sandicor has reciprocity agreements with other MLS's covering other geographic areas, Sandicor's local service centers provide two services: they process listings for San Diego County properties listed by out-of-area agents, and they process listings for out-of-area properties listed with Sandicor subscribers into the out-of area MLS. However, Freeman did not allege facts demonstrating these constitute services occupying markets separate from MLS access. Because the complaint did not allege anyone competes to sell this service and instead affirmatively alleged that no Sandicor agent ever uses these services, the complaint was defective by not alleging that the tie caused substantial economic detriment to competitors attempting to sell these services.[17]

Freeman's core claim is that *Palsson* and its progeny have created judicially imposed price controls on fees for MLS access. From this premise, she argues that when a seller of a price-controlled product attempts to evade the control by packaging the price controlled product with non-price-controlled products, and then charges an inflated price for the package to transfer the clandestine profit from the controlled to the uncontrolled product, it is unnecessary to establish separateness or competitive injury to state a claim for a tying violation of the antitrust laws.

---

[16]The court in *Corwin v. Los Angeles Newspaper Service Bureau, Inc., supra,* 4 Cal.3d 842 at pages 858-859 described several factors that might suggest separateness, including whether competitors offer to sell the services separately, whether buyers are or can be charged separately for the allegedly separate services, and whether the defendant ever sells or offers to sell them separately. Freeman's complaint did not allege that any of these indicia are present regarding use of a third party to input listings into the MLS database.

[17]Indeed, Freeman's attempt to characterize the service of "processing listings for San Diego County properties held by out-of-area agents" as an unlawful tying arrangement discloses another flaw in her tying claim. Her complaint alleged that "by definition" no Sandicor subscriber would ever purchase that service because it is only provided to non-Sandicor members. This allegation is fatal to a tying claim because "when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." (*Jefferson Parish Hospital Dist. No. 2 v. Hyde, supra,* 466 U.S. at p. 16 [104 S.Ct. at p. 1560].) Similar difficulties preclude Freeman from stating a tying claim based on the so-called illusory services (nonexistent monitoring for rules compliance; nonexistent provision of meeting space; nonexistent "other services") because Freeman did not allege Sandicor subscribers would have purchased these "nonexistent" services from other sellers in the tied-product market.

However, Freeman's theory relies solely on language in a dissenting opinion in *Fortner Enterprises v. U.S. Steel* (1969) 394 U.S. 495, 512-514 [89 S.Ct. 1252, 1263-1264, 22 L.Ed.2d 495] (dis. opn. of White, J.), which was later quoted in a footnote to the majority's opinion in *Jefferson Parish Hospital Dist. No. 2 v. Hyde, supra,* 466 U.S. at p. 13, fn. 19 [104 S.Ct. at pp. 1558-1559]. The cited language was dicta because neither case held or even considered whether tying to accomplish price control evasion violated antitrust laws. Freeman cites no authority holding that tying designed to evade price controls, unaccompanied by the anticompetitive effects that the antitrust rules against tying are designed to prevent, violates antitrust laws.[18]

### B. *The Complaint Did Not State a Price Fixing Claim*

 The complaint alleged local associations engaged in unlawful price fixing for Sandicor's MLS by forming Sandicor, merging their fractionalized regional MLS's into Sandicor to create the new countywide MLS, and charging a fixed rate for this new service. Defendants' demurrers argued the complaint did not allege an unlawful price fixing agreement because it showed (1) Sandicor unilaterally set the price for its MLS, and (2) the local associations could not conspire with Sandicor to fix prices because they were not separate entities holding separate and independent economic interests in the sale of a countywide Sandicor MLS.

The essence of Freeman's price fixing claim is that the price charged by Sandicor for its MLS cannot be treated as a unilateral action by the holder of a natural monopoly.[19] She argues Sandicor's separate existence must be disregarded and its pricing decision must be treated as the product of an agreement among the separate local associations.

### 1. *Legal Framework*

 A complaint for unlawful price fixing must allege facts demonstrating that separate entities conspired together. (*City of Mt. Pleasant, Iowa v.*

---

[18]Indeed, as Justice O'Connor noted in her concurring opinion in *Jefferson Parish Hospital Dist. No. 2 v. Hyde, supra,* 466 U.S. 2, the evil that tying rules are designed to alleviate is the impact in the tied product market, not the monopoly power held in the tying product market. O'Connor points out that "[w]hether the tying product is one that consumers might wish to purchase without the tied product should be irrelevant. Once it is conceded that the seller has market power over the tying product it follows that the seller can sell the tying product on noncompetitive terms. The injury to consumers does not depend on whether the seller chooses to charge a supercompetitive price, or charges a competitive price but insists that consumers also buy a product that they do not want." (*Id.* at p. 39, fn. 8 [104 S.Ct. at p. 1572] (dis. opn. of O'Connor, J.).) Thus, the tying rules do not bar the monopolist from extracting exorbitant prices for the desired (tying) product, and a claim of price control evasion is not one remediable under antitrust tying rules.

[19]Unilateral actions by an entity holding a natural monopoly do not offend section 1 of the Sherman Act. (*Alaska Airlines, Inc. v. United Airlines, Inc.* (9th Cir. 1991) 948 F.2d 536, 541.)

*Assoc. Elec. Co-Op.* (8th Cir. 1988) 838 F.2d 268, 274-279 (hereafter *Mt. Pleasant*).) Only separate entities pursuing separate economic interests can conspire within the proscription of the antitrust laws against price fixing combinations. (*Copperweld Corp. v. Independence Tube Corp.* (1984) 467 U.S. 752, 769-771 [104 S.Ct. 2731, 2740-2742, 81 L.Ed.2d 628] (hereafter *Copperweld*).) A general demurrer will be sustained where the complaint makes conclusory allegations of a combination and does not allege with factual particularity that separate entities maintaining separate and independent interests combined for the purpose to restrain trade. (*G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256, 265-266 [195 Cal.Rptr. 211, 41 A.L.R.4th 653].)

Whether separate entities are present requires analysis not of the corporate formalities but of the economic realities under which the entities operate. (*Mt. Pleasant, supra,* 838 F.2d at p. 275.) The *Copperweld* court outlined the broad principles applicable to assessing whether the alleged conspirators are sufficiently separate to be capable of combining within the prohibition of the antitrust laws. *Copperweld* cautioned that the mere existence of separate incorporated entities does not automatically suffice to show that these entities are capable of combining; instead the entities must have separate and independent interests that are combined by the unlawful conspiracy. Under *Copperweld*, legally distinct entities do not conspire if they "pursue[] the common interests of the whole rather than interests separate from those of the [group] itself . . . . Because [such] coordination . . . does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests, it is not activity that warrants [Sherman Act section 1] scrutiny." (*Copperweld, supra,* 467 U.S. at pp. 770-771 [104 S.Ct. at p. 2741].)

The court in *Mt. Pleasant* applied the *Copperweld* principles in the context of separate entities that formed a joint venture[20] to provide a product that the separate entities had previously been unable to provide. In *Mt. Pleasant,* a

---

[20]We use the term "joint venture" in its colloquial rather than legal sense because under *Copperweld* it is the economic substance, not the legal formalities, that determine whether the entities are sufficiently separate and their combination coalesces previously separate and competing interests. (*Copperweld, supra,* 467 U.S. at p. 773, fn. 21 [104 S.Ct. at p. 2743].) For this reason, it does not matter whether local associations are treated as shareholders in an entity that is their alter ego (*Bondi v. Jewels by Edwar, Ltd.* (1968) 267 Cal.App.2d 672, 678 [73 Cal.Rptr. 494] [dismissing antitrust claim against corporation and its alter ego shareholders for not alleging a concert of action by persons "maintaining separate and independent interests"]), or whether Sandicor's corporate form is entirely disregarded and local associations are treated as partners in a partnership owning the countywide MLS. Under the latter characterization, local associations as partners would be treated as agents of the partnership in connection with the partnership business (Corp. Code, § 16301) and the "agent immunity rule" deems agents incapable of conspiring with their principle. (*Applied Equipment Corp. v.*

single entity (Associated) operated an electricity-generating plant. Associated was owned and managed by six "generation and transmission" (G&T) cooperatives that purchased electricity from Associated and transported and wholesaled electricity in their respective regions. The G&T cooperatives were owned by local electricity distribution cooperatives; these local cooperatives purchased electricity from their respective G&T cooperative and retailed it to the customers in their service area. (*Mt. Pleasant, supra,* 838 F.2d at p. 271.)

Associated also sold electricity to third parties at rates higher than it charged its members. (*Mt. Pleasant, supra,* 838 F.2d at p. 272.) A third party customer claimed the dual price scheme was a "price squeeze" conspiracy in violation of antitrust laws. The *Mt. Pleasant* court applied the *Copperweld* principles and concluded the constituent members, although legally distinct entities, comprised a single enterprise pursuing a common goal of generating low-cost electricity that none of the members separately had previously produced or were capable of producing. The *Mt. Pleasant* court examined whether any of the G&T cooperatives pursued interests diverse from those of Associated: were any of the G&T cooperatives actual or potential competitors of Associated or hold sufficiently divergent interests. "In the language of *Copperweld*, [were there facts] show[ing] . . . the coordination between any two defendants [was] a 'joining of two independent sources of economic power previously pursuing separate interests.' " (*Id.* at p. 276, quoting *Copperweld, supra,* 467 U.S. at p. 771 [104 S.Ct. at pp. 2741-2742].)

In *Mt. Pleasant*, the plaintiff claimed the G&T cooperatives had independent and conflicting economic interests because two of the G&T cooperatives disagreed with the dual rate policy, attempted to change it, and would have received economic benefits without the dual rate policy that other G&T cooperatives would not have realized. (*Mt. Pleasant, supra,* 838 F.2d at pp. 276-277.) The *Mt. Pleasant* court rejected the argument, stating:

"We agree with [plaintiff] that these interests were 'diverse,' but not in the sense necessary to create a fact issue on whether these companies are part of a single enterprise. It will always be true that separate companies, in one enterprise, that are located in separate areas and serve separate customers, will have varying interests. This case, considering the disputes among the defendants on the issue of municipal sales, is a perfect example. Coalitions will come and go according to changing conditions and the interests of the various factions.

"But is this a sufficient basis from which to draw a reasonable inference that their coordination is a 'joining of two independent sources of economic

---

power previously pursuing separate interests'? In this case, we think not. Even though the cooperatives may quarrel among themselves on how to divide the spoils of their economic power, it cannot reasonably be said that they are *independent sources* of that power. Their power depends, and has always depended, on the cooperation among themselves. They are interdependent, not independent. The disagreements we have described are more like those among the board members of a single enterprise, than those among enterprises which are themselves separate and independent." (838 F.2d at p. 277.)

The principles articulated in *Copperweld* and applied in *Mt. Pleasant* have been followed by other federal courts. In *In re Appraiser Foundation Anti-Trust Litigation* (D.Minn. 1994) 867 F.Supp. 1407, eight separate associations of appraisers created an entity (Foundation) to set appraisal standards for the industry. Although the constituent members of the Foundation may have competed for members, and the individual members of the constituent associations may have competed with each other for appraisal business, the court rejected the conspiracy claim because the Foundation was a single enterprise whose members were interdependent (because its influence derived from representing the entire industry) and shared a common purpose of establishing standards and ethics for the entire industry. There were no facts showing any of the members pursued interests diverse from or antithetical to the interests of the Foundation. (*Id.* at pp. 1418-1420.) In *Williams v. I.B. Fischer Nevada* (9th Cir. 1993) 999 F.2d 445, involving an antitrust suit alleging that an agreement between a franchiser and his franchisee was unlawful, the court concluded the parties could not conspire because they were part of a common enterprise. (*Id.* at p. 447.) In *F.B. Leopold Co. v. Roberts Filter Mfg. Co., Inc.* (W.D.Pa. 1995) 882 F.Supp. 433, an antitrust suit alleging that a patentee conspired with its independent sales agents, the court applied the *Copperweld* principles and concluded these parties could not conspire because the sales agents, although independent and having a diverse interest of maximizing their commissions, had economic interests and purposes so closely intertwined with the interests of the patentee that they formed a " 'unified economic consciousness incapable of conspiring with itself' [quoting *Pink Supply Corp. v. Hiebert, Inc.* (8th Cir. 1986) 788 F.2d 1313, 1317]." (*Id.* at p. 446.)

In contrast, when independent entities combine through an agreement that controls or restrains trade in products or services in which they previously had been actual or potential competitors, there is a "joining of two independent sources of economic power previously pursuing separate interests" (*Copperweld, supra*, 467 U.S. at p. 771 [104 S.Ct. at p. 2741]) within the antitrust proscriptions against combinations. For example, in *United States v.*

*Topco Associates* (1972) 405 U.S. 596 [92 S.Ct. 1126, 31 L.Ed.2d 515], a group of regional supermarket chains participated in a cooperative buying agency (Topco) to purchase products for resale by its constituents under the Topco label. However, the territories in which each constituent was entitled to market Topco products were restricted. (*Id.* at pp. 598-604 92 [92 S.Ct. at pp. 1128-1132].) The court held this horizontal division of territory violated section 1 of the Sherman Act because the constituent sellers were actual or potential competitors in the sale of Topco products for the territories from which some or all of them were excluded. (*Id.* at pp. 606-612 [92 S.Ct. at pp. 1133-1136].) Similarly, in *United States v. Sealy, Inc.* (1967) 388 U.S. 350 [87 S.Ct. 1847, 18 L.Ed.2d 1238], a consortium of mattress and bedding manufacturers jointly owned and operated Sealy, which licensed the member-manufacturers to use its trademark but granted them territorial exclusivity for sale of Sealy trademarked products. (*Id.* at pp. 352-355 [87 S.Ct. at pp. 1849-1852].) The court concluded the horizontal division of territory violated section 1 of the Sherman Act because the constituent manufacturers were actual or potential competitors of each other in territories from which they were excluded and the association (Sealy) was a mere instrumentality effectuating their agreement to create an unlawful horizontal restriction on competition. (*Id.* at pp. 355-358 [87 S.Ct. at pp. 1851-1853].)

### 2. *Application*

 Freeman admits that Sandicor set the price for its countywide MLS, and that unilateral action is ordinarily fatal to a claim of a price fixing conspiracy. (*Berkey Photo, Inc. v. Eastman Kodak Co.* (2d Cir. 1979) 603 F.2d 263, 272, 294.) To establish the plurality of entities required for Freeman's conspiracy claim, she alleged Sandicor's separate existence should be disregarded and Sandicor's action be treated as the product of an agreement between the constituent local associations. However, the complaint alleged the constituent local associations formed Sandicor to create a new product—the countywide MLS—and did not allege the local associations (1) acting separately had or could have provided this product in competition with each other,[21] or (2) had separate interests that were diverse from or antithetical to the interests of Sandicor in providing a countywide MLS.

---

[21]The complaint did allege that the local associations were competitors. This allegation does not save the complaint. First, a conclusory allegation that two entities are competitors is a legal conclusion that does not preclude a court from dismissing a complaint for not stating a claim. (*Smilecare Dental Group v. Delta Dental Plan* (9th Cir. 1996) 88 F.3d 780, 785 fn. 6.) Second, and more importantly, the complaint alleged only that the local associations competed for members but did not allege the local associations were actual or potential competitors in selling countywide MLS's or could have competed on the price for those services. In an analogous context, the court in *Broadcast Music, Inc. v. CBS* (1979) 441 U.S. 1 [99 S.Ct. 1551, 60 L.Ed.2d 1] evaluated a claim of price fixing filed against ASCAP, an association of

The combination of entities into Sandicor to provide a new service, like the combinations in *Mt. Pleasant* and *In re Appraiser Foundation AntiTrust Litigation,* does not support conspiracy theories of antitrust liability. The combination of the local associations is a single enterprise whose members are interdependent (because its product arises only from the unified whole) and share the common purpose of creating and marketing the new product rather than a "joining of two independent sources of economic power previously pursuing separate interests." (*Copperweld, supra,* 467 U.S. at p. 771 [104 S.Ct. at p. 2741].) Because the complaint did not allege facts that suggest the local associations pursued interests diverse from or antithetical to the interests of Sandicor, the complaint does not establish the plurality of separate entities necessary to a price fixing conspiracy claim.

Freeman, citing the numerous cases in which practices by real estate brokers' associations operating MLS's were held to violate antitrust laws, argues these cases were necessarily predicated on the express or implied conclusion that the constituent owners of the MLS were separate entities capable of conspiring. However, those cases are not inconsistent with our analysis because they did not involve a claim, nor did any of those courts hold, that the operators of the MLS violated antitrust laws by conspiring to fix the price of MLS's.

In the first category of cases relied on by Freeman, of which this court's decision in *NAR I* is illustrative, the antitrust violations included the MLS rule permitting only "exclusive right to sell" MLS listings and the policies and practices that facilitated price fixing of brokers' commissions.[22] (*NAR I, supra,* 120 Cal.App.3d at pp. 477-487.) Because both of these restrictions involved horizontal restraints on competition at the level the individual brokers would otherwise have freely competed with each other, the requisite

---

copyright holders that granted blanket licenses to play the music for which its members held copyrights. The court observed that "to the extent the blanket license is a different product [from the licenses that its individual members could grant], ASCAP is not really a joint sales agency offering the individual goods of many sellers, but is a separate seller offering its blanket license . . . . ASCAP, in short, made a market in which individual composers are inherently unable to compete fully effectively. [¶] . . . [¶] . . . Joint ventures and other cooperative arrangements are . . . not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all." (*Id.* at pp. 22-23 [99 S.Ct. at p. 1564], fn. omitted.) Similarly, Sandicor's members cannot have separately offered or competed to offer the same product as Sandicor.

[22]Similar concerns were present in other MLS cases relied on by Freeman. (See, e.g., *United States v. Real Estate Boards* (1950) 339 U.S. 485, 489 [70 S.Ct. 711, 714, 94 L.Ed. 1007] [price fixing for brokers' commissions]; *United States v. Metro MLS* (E.D.Va., Sept. 20, 1973, No. 210-73-N) 1974-2 Trade Cas. (CCH) ¶ 75,311 [1973 WL 918] [conspiracy to fix brokers' fees]; *United States v. Los Angeles Realty Board* (C.D.Cal., Mar. 19, 1973, No. 70-2855-CC) 1973-1 Trade Cas. (CCH) ¶ 74,366 [1973 WL 767] [consent decree enjoining fixing of brokers' commissions].)

coalescence of "independent sources of economic power previously pursuing separate interests" (*Copperweld, supra*, 467 U.S. at p. 771 [104 S.Ct. at p. 2741]) was present to satisfy the combination element of price fixing.

The second group of cases of which *Palsson* is illustrative[23] involved denial of access to the MLS, and evaluated MLS rules that restricted competition at the level the individual brokers competed with each other. In *Palsson*, the MLS operator held a monopoly over the relevant MLS but limited MLS access to its members. *Palsson* concluded that denying access was properly evaluated as a group boycott.[24] (*Palsson, supra*, 16 Cal.3d at pp. 931-932.) ██ A horizontal group boycott involves the joint efforts of competitors at the same level of distribution as the plaintiff to disadvantage that competitor by denying him the tools necessary to compete. (See, e.g., *United States v. Realty Multi-List, Inc., supra*, 629 F.2d at p. 1361.) The denial of access cases involved horizontal restraints on competition at the level individual brokers would otherwise have competed with each other, which provides the requisite coalescence of "independent sources of economic power previously pursuing separate interests" (*Copperweld, supra*, 467 U.S. at p. 771 [104 S.Ct. at p. 2741]) that satisfied the combination element.

██ The MLS cases relied on by Freeman establish only that the requisite plurality of entities pursuing independent economic interests exists if the conduct complained of operates to restrain competition at the same level at which these actors previously had been actual or potential competitors. However, those cases have no application here because the alleged unlawful agreement—charging a set price for countywide MLS's—does not restrain competition at the same level the local associations were actual or potential competitors.[25]

---

[23]Other cases cited by Freeman of the *Palsson* type include both state cases (such as *Glendale Bd. of Realtors v. Hounsell* (1977) 72 Cal.App.3d 210 [139 Cal.Rptr. 830] and *Feldman v. Sacramento Bd. of Realtors, Inc.* (1981) 119 Cal.App.3d 739 [174 Cal.Rptr. 231]) and federal cases. (See, e.g., *United States v. Realty Multi-List, Inc.* (5th Cir. 1980) 629 F.2d 1351.)

[24]Although *Palsson* treated the denial of access as a group boycott it did not use the "per se" approach ordinarily applicable to horizontal group boycotts but instead evaluated the restrictions under the "rule of reason" test. (*Palsson, supra*, 16 Cal.3d at pp. 931-934.)

[25]The denial of access cases also are distinguishable from Freeman's price fixing claim because diverse and conflicting economic interests are present in the former group of cases and not present here. In *Palsson*, for example, the association controlled the MLS and restricted access to its members. Although the economic interest of the association's constituent members—the individual realtors—was to narrow the group of persons with access to this essential competitive tool, the association presumably had an interest in expanding its membership and had no direct stake in disadvantaging individual brokers. No similar conflicting economic interests are present with regard to the price charged by Sandicor because

### C. *The Complaint Did Not State a Group Boycott Claim*

█ Freeman's complaint alleged that she asked Sandicor to appoint her as a service center, that the local associations combined to cause Sandicor to refuse Freeman's request, and that consumers of Sandicor's services were injured because Freeman would have charged a lower price than the other local associations had she been authorized to act as a service center. The demurrers argued (1) the group boycott theory suffered from the same defect as the price fixing conspiracy theory because it did not show the local associations had economic interests separate and independent from Sandicor, and (2) Freeman's conclusory allegation that the local associations combined to cause Sandicor to refuse her request was insufficient to satisfy the requirement of alleging specific overt acts in furtherance of the conspiracy.

#### 1. *Legal Principles*

█ The antitrust laws do not preclude a party from unilaterally determining the parties with which, or the terms on which, it will transact business. However, it is a violation of the antitrust laws for a group of competitors with separate and independent economic interests, or a single competitor with sufficient leverage, to force another to boycott a competitor at the same level of distribution. (*G.H.I.I. v. MTS, Inc., supra,* 147 Cal.App.3d at pp. 266-268.) █ ██ In *G.H.I.I.,* the plaintiff was a record retailer that alleged three other record retailers (defendants Record Factory, Integrity, and Tower) used their market power to coerce record wholesalers to grant price discounts to defendants but not to their competitors, a so-called vertical boycott.[26] (*Id.* at pp. 267-269.) The court held that the complaint stated a claim against Tower because it alleged Tower used

both Sandicor and its constituent owners share a common interest in maximizing the price and resulting profits from the service they sell.

[26]In a vertical boycott, entities at different levels of distribution combine to deny a competitor at one level the benefits enjoyed by the members of the vertical combination. For example, in *Redwood Theatres, Inc. v. Festival Enterprises, Inc.* (1988) 200 Cal.App.3d 687 [248 Cal.Rptr. 189], an agreement between a movie exhibitor and certain film distribution companies that allegedly excluded a competing movie exhibitor from obtaining films from the distributors was evaluated as a vertical boycott. (*Id.* at p. 703; see also *Bert G. Gianelli Distributing Co. v. Beck & Co.* (1985) 172 Cal.App.3d 1020, 1042-1049 [219 Cal.Rptr. 203] [manufacturer's termination of distributor based on complaints from competing distributors analyzed as vertical boycott].) In contrast, horizontal boycotts involve entities at the same level combining to deny a competitor at their level the benefits enjoyed by the members of the group. (See, e.g., *Oakland-Alameda County Builders' Exchange v. F. P. Lathrop Constr. Co.* (1971) 4 Cal.3d 354 [93 Cal.Rptr. 602, 482 P.2d 226] [contractors who participated in a bid depository agree to boycott contractors who were not participants]; *Zoslaw v. MCA Distributing Corp.* (9th Cir. 1982) 693 F.2d 870, 884-887.) Freeman's theory appears to assert a vertical group boycott because she alleges she was denied a benefit by Sandicor (appointment as a service center operator), even though granting her request would have been in Sandicor's

threats, coercion, intimidation and boycott in furtherance of its goal of forcing wholesalers to boycott plaintiff; however, the complaint did not state a claim against Record Factory or Integrity because no acts by them were alleged that furthered the coercion. (*Id.* at p. 269.)

An antitrust claim must plead the formation and operation of the conspiracy and the illegal acts done in furtherance of the conspiracy. (*Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 119 [81 Cal.Rptr. 592, 460 P.2d 464].) California requires a "high degree of particularity" in the pleading of Cartwright Act violations (*Motors, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735, 742 [162 Cal.Rptr. 543]), and therefore generalized allegations of antitrust violations are usually insufficient.[27] (*Chicago Title Ins. Co. v. Great Western Financial Corp., supra,* 69 Cal.2d at pp. 317, 326-328.) The unlawful combination or conspiracy must be alleged with specificity. The *Chicago Title* court noted that " 'contracts, combinations or conspiracies in restraint of . . . trade or commerce cannot be alleged generally in the words of the statute but . . . facts must be set forth which indicate the existence of such contracts, combinations or conspiracies.' " (*Id.* at pp. 316-317.) Therefore, general allegations of a conspiracy unaccompanied by factual allegations of overt acts in furtherance of conspiracy are insufficient to state a group boycott antitrust claim. (*Id.* at pp. 317-318; *Bartley v. California Association of Realtors* (1980) 115 Cal.App.3d 930, 935 [173 Cal.Rptr. 284].) The absence of factual allegations of specific conduct in furtherance of the conspiracy to eliminate or reduce competition makes the complaint legally insufficient. (*Jones v. H. F. Ahmanson & Co., supra,* 1 Cal.3d at p. 119.)

2. *Application*

Freeman alleged the refusal to allow her to become a service center was conceived and initiated by the local associations, which would have been competitors of Freeman's in operating a service center, and the local

best interests, because of the actions of entities (local associations) that would have competed with Freeman at the service center level. This theory appears irreconcilable with Freeman's claim that local associations do not have an identity separate from Sandicor. She alleged the refusal to appoint her as a service center benefited local associations by shielding them from competition but was contrary to Sandicor's best interests. Although the local associations' interest in excluding competing service centers may provide the plurality of entities pursuing interests separate from Sandicor for purposes of determining whether a group necessary for a group boycott exists, we perceive Freeman's group boycott claim necessarily disavows any reliance on her alter ego allegations.

[27]The federal courts also recognize that conspiracy is the gravamen of the complaint (*Dahl, Inc. v. Roy Cooper Co.* (9th Cir. 1971) 448 F.2d 17, 19) and must be pleaded in more than conclusory terms. (*Gilbuilt Homes, Inc. v. Continental Homes, etc.* (1st Cir. 1981) 667 F.2d 209, 210.)

associations used their "market power and position to cause Sandicor to refuse" to appoint Freeman as a service center. Freeman's conclusory statement that the local associations caused Sandicor to refuse Freeman's request is insufficient to satisfy the requirement of alleging specific overt acts in furtherance of a conspiracy to boycott Freeman. The complaint contained no allegation of specific acts, threats, coercion, intimidation or other unlawful conduct employed by local associations to force Sandicor to boycott Freeman.[28]

Freeman argues that the facts alleged in her group boycott claim were adequate because a refusal to deal resulting from coercive pressure satisfies the combination requirement. Therefore, she concludes, the local associations' coercion of Sandicor to refuse her request sufficed for this cause of action. However, Freeman did not allege (even in conclusory terms) that the local associations coerced Sandicor into refusing her request, or any specific acts by local associations that constituted the coercion. Because Freeman was given leave to amend her complaint but elected to stand on the allegations as pleaded, we construe any ambiguity against Freeman (*Casella v. City of Morgan Hill* (1991) 230 Cal.App.3d 43, 48 [280 Cal.Rptr. 876]) and conclude that her " 'failure to make a good pleading probably arises in a lack of facts rather than in the fault of the pleader.' " (*Chicago Title Ins. Co. v. Great Western Financial Corp., supra,* 69 Cal.2d at p. 328, quoting *Dukes* v. *Kellogg* (1900) 127 Cal. 563, 565 [60 P. 44].)

We reject Freeman's argument that the denial of access cases demonstrate she has stated a valid group boycott claim. Denying her request to become a service center is fundamentally different from excluding her access to the MLS. The denial of access cases have recognized that exclusion from an MLS only superficially resembles other forms of group boycotts.[29] (*Palsson, supra,* 16 Cal.3d at pp. 930-934.) *Palsson* held the MLS operator's freedom

---

[28]Indeed, Freeman's claim appears to suffer from the same deficiency as did the plaintiff's claim against Record Factory and Integrity in *G.H.I.I.* Here, Freeman alleged only that local associations somehow used their "market power and position" to cause Sandicor to "boycott" Freeman; similarly, the plaintiff's boycott allegations against Record Factory and Integrity alleged they "employed economic leverage" to obtain the benefits denied to plaintiff, which the court found insufficient absent allegations of coercion or other unlawful conduct. (*G.H.I.I. v. MTS, Inc., supra,* 147 Cal.App.3d at p. 269.)

[29]The federal denial of access cases have similarly recognized that although denial of access to an MLS bore some resemblance to classic group boycott arrangements, such " 'easy labels do not always supply ready answers' " (*United States v. Realty Multi-List, Inc., supra,* 629 F.2d at p. 1365) and have rejected the per se illegality test ordinarily applicable to classic group boycotts in favor of a rule of reason analysis when examining denial of access to MLS's. (*Id.* at pp. 1366-1369.) These observations convince us that the denial of access cases have no application to whether the conduct complained of in this case—denial of Freeman's request to become a service center—can be actionable as a group boycott.

to exclude nonmembers was limited because the MLS provided an irreplaceable tool for realtors and the anticompetitive impact of excluding them from MLS access far outweighed any justifications for exclusivity. *Palsson* explained at page 938 that the right of an MLS operator to select its subscribers was not absolute because: "While the Marin County Board of Realtors may permissibly provide some exclusive benefits to its members, access to the multiple listing service is so essential to nonmembers if they are to compete effectively that such access must be granted to all licensed salesmen and brokers who choose to use the service."

However, we perceive no similar reason here to limit the ordinary rule that a producer may choose its own distributors. (*Albrecht v. Herald Co.* (1968) 390 U.S. 145, 150 [88 S.Ct. 869, 871-872, 19 L.Ed.2d 998], overruled on other grounds by *State Oil Co. v. Khan* (1997) 522 U.S. 3 [118 S.Ct. 275, 139 L.Ed.2d 199].) Freeman's complaint did not allege that acting as a service center is so essential to her business that she cannot compete as a real estate agent unless she is appointed as a service center. In *Palsson*, the court examined whether the association could limit admission to only those agents who were primarily engaged in the business of selling real estate. *Palsson* observed (16 Cal.3d at p. 938) that: "The 'primarily engaged' rule is sometimes justified on the grounds that the board has the right to choose its own members. It has never been the law in California that a voluntary association may be forced to open its membership rolls to all who apply. On the other hand, when membership in an association is a practical economic necessity, judicial review is available to examine bases for exclusion from membership. [Citations.] In the case at bar, . . . membership in the Marin County Board of Realtors must be termed a practical economic necessity for real estate salesmen. As noted above, without membership in the board, a salesman is denied employment with 75 percent of the residential real estate brokers in the county and a subsequent reasonable opportunity to earn a livelihood in real estate. The economic benefits of membership mandate that exclusion be subject to judicial review." (Fn. omitted.)

*Palsson*'s rationale demonstrates the inapplicability of the denial of access cases to Freeman's group boycott claim. These cases do not stand for the proposition that Sandicor must appoint as service centers all who apply or confront antitrust liability under a group boycott theory. Unlike the denial of access cases, there is no similar practical economic necessity that Freeman act as a service center. Because Freeman cites no pertinent authority that an antitrust group boycott claim arises whenever a producer refuses to grant a new franchise to an applicant, we conclude Freeman's group boycott claim was properly rejected.

### D. *Excessive Prices Do Not Violate Antitrust Laws*

 Freeman's final antitrust claim contends that because Sandicor's monthly fee for access to the MLS is more than some brokers can afford, Sandicor has violated the antitrust laws by pricing these brokers out of the market and thereby unreasonably restrained trade by limiting the pool of competing brokers.[30]

Freeman's contention is based on the *Palsson* language that an MLS may not exclude nonmembers from its service but may charge nonmembers "a reasonable fee for use of the service consistent with the per-capita costs of operation."[31] (*Palsson, supra,* 16 Cal.3d at p. 940.) Although the courts have recognized this language was dicta (see *Feldman v. Sacramento Board of Realtors, supra,* 119 Cal.App.3d at p. 747), Freeman argues *Palsson* and its progeny have imposed judicial price controls on the fees that an MLS may charge. From this premise, Freeman argues she has pleaded a claim for antitrust violations by alleging that the amounts charged by Sandicor are unreasonable and operate to restrain competition.

We evaluate Freeman's argument by first defining what is not at issue. First, Freeman's excessive price argument must be evaluated as asserting an antitrust violation based on the unilateral pricing decisions of Sandicor for its countywide MLS; we have already rejected her claim of a price fixing combination among competitors that resulted in excessive prices. Second, Freeman's excessive price argument does not assert discriminatory pricing, but instead admits that all users are charged the same price. Finally, Freeman's excessive price argument does not suggest Sandicor cannot charge some amount for its service, but only alleges that the price actually charged is unreasonable because it is excessive.

---

[30]Although we reach this claim, we have substantial doubt Freeman has standing to assert this claim. Freeman admits she is not one of the brokers excluded from the market based on inability to pay. Therefore the antitrust injury alleged—exclusion from the broker market—is not an injury she has suffered. (*Cal. Computer Products v. Intern. Business Machines* (9th Cir. 1979) 613 F.2d 727, 732 [antitrust standing conferred only on those injured by the antitrust violation].) Indeed, because Freeman alleged she has remained active in selling real estate, she has benefited to the extent that higher prices have reduced the pool of her competitors, thereby undercutting her standing on this claim. (*Atlantic Richfield Co. v. USA Petroleum Co.* (1990) 495 U.S. 328, 336-337 [110 S.Ct. 1884, 1890-1891, 109 L.Ed.2d 333] [plaintiff lacked standing because it was benefited rather than harmed by the antitrust violation].)

[31]The federal courts that have found MLS access limitations invalid and mandated they be made available to qualifying realtors have similarly approved charging a fee "representing, for example, the actual cost of starting up his service and a *pro rata* contribution toward the costs of the maintenance and development of [the MLS], including the accumulation of reasonable reserves." (*United States v. Realty Multi-List, Inc., supra,* 629 F.2d at p. 1387.)

 The law is clear that unilateral pricing decisions do not violate section 1 of the Sherman Act.[32] (*Alaska Airlines, Inc. v. United Airlines, Inc., supra,* 948 F.2d 536, 541 [unilateral price charged for access to computerized reservations systems (CRS) does not offend section 1's ban on combinations; pricing evaluated under Sherman Act section 2 monopolization provisions].) Furthermore, section 2 of the Sherman Act is not violated merely because the holder of a monopoly charges high prices. The *Alaska Airlines* court, rejecting an antitrust claim that alleged an operator of a CRS was extracting excessive prices for access to its service, observed:

"The Sherman Act also has not been interpreted to penalize natural monopolies. A firm that creates a valued service or product should not be punished with treble damages and criminal sanctions merely because the firm finds itself to be the holder of a natural monopoly. [Citation.] Government regulation, as opposed to treble damages and criminal liability under the Sherman Act, is generally thought to be the appropriate remedy for the difficulties posed by natural monopolies. [Citation.] '[J]udicial oversight of pricing policies would place the courts in a role akin to that of a public regulatory commission. We would be wise to decline that function unless Congress clearly bestows it upon us.' [(Quoting *Berkey Photo v. Eastman Kodak Company* (2d Cir. 1979) 603 F.2d 263, 294.)]

". . . . . . . . . . . . . . . . . . . . . . . . .

"[S]etting high prices in the original 'monopoly' market . . . represent[s] the cost that we incur when we permit efficient and natural monopolies. See *Berkey Photo*, 630 F.2d at [p.] 294 ('setting a high price may be a use of monopoly power, but it is not in itself anticompetitive'). The Supreme Court has consistently held that there must be 'predatory' conduct to attain or perpetuate a monopoly for a monopolist to be liable under Section 2. [Citations.]" (948 F.2d at pp. 548-549, fns. omitted.)

 These observations of the *Alaska Airlines* court convince us that unilateral action by a monopoly holder in charging allegedly excessive prices, standing alone, does not ordinarily violate antitrust laws even though high prices may have some ancillary effect on the ability of consumers of those products to compete. We therefore examine whether the California

[32]This alone would appear to doom Freeman's Cartwright Act claim. The Cartwright Act bans combinations but does not have any parallel to Sherman Act section 2's antimonopoly provisions. (*State of California ex rel. Van de Kamp v. Texaco, Inc., supra,* 46 Cal.3d at pp. 1152-1169.) However, even if some form of Sherman Act section 2 is included in the Cartwright Act, we nevertheless conclude Sandicor's price decisions are not actionable under the Cartwright Act.

courts have carved an exception to ordinary antitrust laws, unique to MLS charges, that impose price controls on MLS's under the Cartwright Act.

We do not interpret *Palsson* and its progeny as construing the Cartwright Act to permit judicial oversight of unilateral price decisions. The focus of *Palsson* was not the price charged for MLS access, but whether two specific practices—denial of MLS access to nonmembers and denial of membership to part-time realtors—were unreasonable combinations in restraint of trade. (*Palsson, supra,* 16 Cal.3d at pp. 934-940.) *Palsson* concluded these rules did restrain trade, did not satisfy the rule of reason requirements, and accordingly ordered these rules be eliminated. (*Id.* at p. 940.) Although *Palsson* stated "nonmembers may be charged a reasonable fee for use of the service consistent with the per-capita costs of operation" (*ibid.*), this comment was dicta and not part of its antitrust analysis.[33]

The courts in *NAR I, NAR II* and *Palsson* did not evaluate whether the price charged by an MLS violated antitrust laws. Those cases evaluated whether denial of MLS access to nonmembers was an unlawful group boycott, whether permitting only exclusive rights to sell MLS listings was an unlawful restraint on trade and whether certain policies and practices facilitated price fixing for brokers' commissions. Although this court held that SDAR was required to grant access to the MLS and enjoined SDAR from imposing any cost for use of such service beyond the cost of providing the service itself, this aspect was part of the remedy and not part of the antitrust analysis.

*Feldman v. Sacramento Bd. of Realtors, Inc., supra,* 119 Cal.App.3d 739 is the only California case of which we are aware that directly evaluates an antitrust claim based solely on the allegation the price charged for MLS's was excessive. In *Feldman,* a realtor sought to use several MLS's without paying the initiation or participation fees charged for those services. The realtor argued he should be entitled to purchase each MLS book whenever he had occasion to use it. In his lawsuit asserting denial of the right to purchase individual books violated the Cartwright Act, the trial court granted summary judgment in favor of the MLS's based on their showing that the initiation and participation fees that they charged were nondiscriminatory and based on the costs associated with operating the MLS. (*Id.* at pp. 742-743.) *Feldman* reversed the trial court, reasoning that because any practice that might restrain competition must be assessed under a "rule of reason" analysis (*id.* at p. 745), the fact that the fees charged were consistent

---

[33]A second case evaluating MLS practices, *Glendale Bd. of Realtors v. Hounsell, supra,* 72 Cal.App.3d 210, merely applied *Palsson* and held that denial of access to nonmembers, regardless of membership criteria, violated the rule of reason. (*Id.* at pp. 212-213.)

with defraying the costs incurred in operating the MLS overhead would not preclude a trier of fact from nevertheless determining the fees were "unreasonably restrictive of competition." (*Id.* at pp. 746-747.) *Feldman* then evaluated whether the plaintiff's antitrust claim satisfied what the court perceived to be the applicable pleading requirements for a rule of reason violation. Relying on *Tampa Electric Co. v. Nashville Co.* (1961) 365 U.S. 320 [81 S.Ct. 623, 5 L.Ed.2d 580] and *Magnus Petroleum Co., Inc. v. Skelly Oil Co.* (7th Cir. 1979) 599 F.2d 196, 201-202, *Feldman* held the plaintiff must allege the defendant held monopolistic powers and engaged in practices that seriously hampered the competitive market to which the plaintiff belonged, and ultimately concluded the pleading was deficient. (*Feldman v. Sacramento Bd. of Realtors, Inc., supra,* 119 Cal.App.3d at pp. 747-748.)

We are convinced *Feldman*'s conclusion that a plaintiff states an antitrust claim under the Cartwright Act based solely on the allegation that a monopolist's excessive price for its product unreasonably restrains trade was erroneous and should not be perpetuated. ▪▪▪ First, *Feldman* was decided before *State of California ex rel. Van de Kamp v. Texaco, Inc., supra,* 46 Cal.3d 1147, decided that the Cartwright Act bans combinations but does not have any provisions parallel to Sherman Act section 2's antimonopoly provisions. ▪▪▪ Therefore *Feldman* gave no guidance on whether a monopolist's unilateral practices offend the Cartwright Act. Second, as explained by the *Alaska Airlines* court, setting a high price may be a use of monopoly power but is not in itself anticompetitive; there must be predatory conduct to attain or perpetuate a monopoly before a monopolist can be assessed treble damages under a Sherman Act section 2 claim. Third, the cases relied on by *Feldman* for its holding, *Tampa Electric Co. v. Nashville Co., supra,* 119 Cal.App.3d 739, and *Magnus Petroleum Co., Inc. v. Skelly Oil Co., supra,* 599 F.2d 196, do not support the proposition that Sherman Act liability arises merely because a monopolist's excessive price unreasonably restrains trade.[34]

The proposition in *Feldman* on which Freeman relies has never been cited by any subsequent court and is inconsistent with federal authorities construing the Sherman Act. We therefore decline to follow *Feldman*'s conclusion

---

[34]The focus of the *Tampa Electric* and *Magnus Petroleum* courts was whether the contracts there violated the broader provisions of section 3 of the Clayton Act (15 U.S.C. § 14), which proscribes "exclusive dealings" contracts by which a seller agrees to sell or lease goods on condition that the purchaser not buy goods from the seller's competitors if those contracts substantially lessen competition or tend to create a monopoly in any line of commerce. The *Tampa Electric* court concluded that because the contract did not violate the Clayton Act it was unnecessary to reach any Sherman Act claims. (365 U.S. at p. 335 [81 S.Ct. at p. 632].) The *Magnus Petroleum* court found no Clayton Act violation on the exclusive dealings aspect of the claim (599 F.2d at pp. 200-204) and then concluded that the subsidiary argument, which effectively alleged a tying between the agreement to provide the plaintiff financing and its agreement to purchase goods, was mooted by its determination that there was no substantial adverse effect on competition. (*Id.* at p. 204.) Neither case supports *Feldman*'s conclusion

that a monopolist's allegedly excessive price, without more, gives rise to antitrust liability merely because the plaintiff alleges that price unreasonably restrains trade.[35]

## IV

### FREEMAN'S CLAIM FOR VIOLATION OF THE INJUNCTION

■ Freeman asserts she stated a valid damage claim against SDAR for violation of the 1984 injunction. She argues the injunction entered after remand in *NAR II* limited SDAR's fees for MLS access to a "reasonable" charge and SDAR violated that injunction by charging $100 per month when the reasonable charge for MLS access was $25 per month. Neither Freeman nor Sandicor was a party in either *NAR I* or *NAR II.*

Defendants dispute whether Freeman has standing to prosecute a claim for an alleged violation of an injunction issued in an action to which she was not a party.[36] The defendants also dispute whether the substance of the injunction was intended to impose price controls or only assure equal access to SDAR's MLS. It is unnecessary to reach these issues because we conclude the complaint on its face shows that the party enjoined, SDAR, is not the party whose actions Freeman alleged violate the injunction.

Freeman alleged Sandicor was the party selling the countywide MLS and unilaterally setting and collecting the allegedly excessive fees for that

that an antitrust claim arises merely because a monopolist's excessive price unreasonably restrains trade.

[35]To hold otherwise would place this court in the role of a price control board. In an analogous context, the court in *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205 [27 Cal.Rptr.2d 396] was asked to use the statutory law of unfair competition (Bus. & Prof. Code, § 17200 et seq.) to determine that a fee charged by a bank was so excessive it was invalid for unconscionability. Rejecting this claim, the court observed at page 218 that "[j]udicial review of one service fee charged by one bank is an entirely inappropriate method of overseeing bank service fees. . . . '[T]he control of charges, if it be desirable, is better accomplished by statute or by regulation authorized by statute than by *ad hoc* decisions of the courts. Legislative committees and an administrative officer charged with regulating an industry have better sources of gathering information and assessing its value than do courts in isolated cases.' [(Quoting *Lazzareschi Inv. Co. v. San Francisco Fed. Sav. & Loan Assn.* (1971) 22 Cal.App.3d 303, 311 [99 Cal.Rptr. 417].)] [¶] This case implicates a question of economic policy: whether service fees charged by banks are too high and should be regulated. 'It is primarily a legislative and not a judicial function to determine economic policy.' [(Quoting *Max Factor & Co. v. Kunsman* (1936) 5 Cal.2d 446, 455-456 [55 P.2d 177].)]" (22 Cal.App.4th at p. 218.)

[36]Freeman cites no authority that she has standing. Indeed, Freeman cites no authority holding a private civil action seeking damages for violation of an injunction may be maintained, although some courts have stated in dicta that such an action is available. (See *H. J. Heinz Co. v. Superior Court* (1954) 42 Cal.2d 164, 175 [266 P.2d 5].)

service. However, the complaint did not allege Sandicor is restrained by the injunction against SDAR; to the contrary, the complaint alleged that only SDAR violated the injunction. An action claiming violation of an injunction must plead and prove the party was bound by the order and had the ability to comply with the order. (*Board of Supervisors v. Superior Court* (1995) 33 Cal.App.4th 1724, 1736-1737 [39 Cal.Rptr.2d 906].) Assuming arguendo the injunction was intended to place an upper limit on fees that could be charged for MLS's,[37] the complaint did not allege the party that set the fees (Sandicor) was bound by the injunction, or that the party that was bound by the injunction (SDAR) had the ability to comply with the injunction by charging fees at levels below those set by Sandicor.

### DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal.

Benke, Acting P. J., and Huffman, J., concurred.

A petition for a rehearing was denied January 24, 2000, and appellants' petition for review by the Supreme Court was denied April 12, 2000. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

[37]Although we conclude it is unnecessary to evaluate the merits of Freeman's price control claim, our judgment would remain unchanged even were we to reach this issue. The purpose of the language permitting "reasonable fees [to] be charged for all services" in the injunction, which we would construe de novo as a matter of law (*Lane v. Lane* (1953) 117 Cal.App.2d 247, 251 [255 P.2d 110]), has been mooted by changed circumstances. The injunction was issued under circumstances in which SDAR members and nonmembers were treated differently: members had access to SDAR's MLS (apparently without any fees beyond those paid for association membership) and nonmembers had no access. The principal holding of *Palsson, NAR I and NAR II* was that the benefits of the MLS must be equally available to members and nonmembers; the fees authorized by the injunction were to assure the burdens accompanying the benefits of the MLS be fairly shared by members and nonmembers. However, the access/fee structure under the Sandicor MLS has mooted any concerns over differential benefits and burdens; all realtors have the same access and costs of access regardless of their affiliations with any local association. Because the intent of the reasonable fees sentence of the injunction operated in an environment that is no longer present, that aspect of the injunction appears to have no further purpose.