[No. F053553. Fifth Dist. Dec. 17, 2008.]

UAS MANAGEMENT, INC., Plaintiff and Appellant, v.
MATER MISERICORDIAE HOSPITAL et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of sections 3., 4. and 5. of part B. and part C.

COUNSEL

Hanson Bridgett Marcus Vlahos & Rudy, Michael A. Duncheon, Stephen B. Peck, Michael B. McNaughton; Spiegel Liao & Kagay, Michael I. Spiegel and Charles M. Kagay for Plaintiff and Appellant.

Manatt, Phelps & Phillips, Martin J. Thompson, Chad S. Hummel, Joanna S. McCallum; Allen, Proietti & Fagalde and Terry L. Allen for Defendants and Respondents.

OPINION

**VARTABEDIAN, Acting P. J.**—This is an appeal from judgment entered after a series of motions for summary adjudication disposed of all antitrust causes of action asserted by appellant UAS Management, Inc., against respondents Mater Misericordiae Hospital and its parent, Catholic Healthcare West (collectively, respondent). We will conclude the judgment must be reversed.

## FACTS AND PROCEDURAL HISTORY

For purposes of the motions for summary judgment and summary adjudication, the parties stipulated that certain facts were true. As to other facts, in accordance with the relevant standard of review, we set forth the facts most favorable to the party opposing the motions, to the extent such facts are supported by the evidence before the trial court. (See *O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 284 [30 Cal.Rptr.3d 507, 114 P.3d 753].) As a result, the following statement of facts is only provisional, and the parties undoubtedly will contest some or all of the stated facts if this matter proceeds to trial.

Respondent owns and operates an inpatient hospital in the City of Merced. Respondent is the only provider of inpatient services in the Merced geographical market and, as such, has monopoly power with respect to those services. In addition, at the times relevant to this action, respondent operated a separate outpatient surgery center in Merced and performed outpatient surgeries at its hospital, as well.[1]

In 2002, appellant opened for business as an outpatient surgery center. Appellant is owned by local physicians.

When respondent learned that appellant would be competing for outpatient business, respondent negotiated with local health insurers for the contract provisions at issue in this case. Respondent's purpose in insisting on the contract provisions was to drive appellant out of business.

The contract provisions in issue embodied respondent's refusal to sell inpatient services to the insurers unless the insurers agreed to the contract provisions giving preference to respondent as an outpatient provider. The contracts vary in their precise wording from one insurer to another. However, all of the contracts contain what the parties call "exclusivity" provisions, in essence, requiring that the insurer would neither add to its network nor contract with any other outpatient surgery center during the period of the contract. Because of the contracts, the insurers refused to negotiate with appellant to permit appellant to become an in-network or preferred provider.

---

[1] Respondent's outpatient surgery center was destroyed by fire in May 2006. Thereafter, the exclusive contracts at issue here became inoperative.

Of the six relevant insurance companies, two would not pay for any services rendered by nonpreferred providers. As to the other four companies, appellant could not determine in advance how much the insurer would pay for particular services and was required to negotiate individually with each patient concerning that patient's copayments and deductibles for each procedure. Because of the absence of a preferred provider contract, appellant was required to expend additional staff time in selling its services to prospective patients, in obtaining payment from the insurers, and in assuring that use of appellant's facility was preapproved so physicians could be paid for their services by the insurer.

For reasons ranging from the quality of appellant's facility, the self-interest of physicians who preferred to use a facility they owned, and competitive pricing for the patients' share of the charges,[2] appellant was able steadily to increase its share of the outpatient surgery market for Merced. Still, appellant was unable to become an in-network or preferred provider for any insurer in the Merced health insurance market until, by coincidence, respondent's outpatient facility was destroyed by fire and respondent could no longer provide outpatient services under the contracts.

Appellant sued respondent in October of 2004, alleging violations of the Cartwright Act[3] and the unfair competition law,[4] in addition to a tort claim for interference with prospective economic advantage. The complaint alleged two separate theories for the Cartwright Act violation. In the first cause of action, it alleged respondent conspired with the insurers to create an unlawful exclusive dealing arrangement, which constituted an unreasonable restraint of trade. In the second cause of action, appellant alleged respondent's refusal to sell inpatient services unless the insurers agreed exclusively to purchase respondent's outpatient services constituted an unlawful tying arrangement. The unfair competition (third cause of action) and tortious interference claims (fourth cause of action) were derivative and were based on the unlawfulness of the Cartwright Act conduct.

Respondent moved for summary judgment or summary adjudication. (Code Civ. Proc., § 437c, subds. (a), (f).) After extensive briefing and submission of voluminous evidence, the court granted summary adjudication of appellant's

---

[2] For example, appellant would waive the balance of charges not covered by insurance to try to equalize patient payments with the copayments that would have been required under the preferred provider contracts.

[3] Business and Professions Code section 16720 et seq. (all further section references are to the Bus. & Prof. Code unless otherwise stated).

[4] Section 17200.

tying claim. The court denied summary adjudication of the other three causes of action. Appellant filed an amended complaint, adding two additional theories of recovery under the Cartwright Act, unlawful group boycott (fifth cause of action) and unreasonable restraint of trade (sixth cause of action). Respondent filed a second, very narrow, motion for summary adjudication of the exclusive dealing cause of action, which the court denied. On respondent's motion for reconsideration of the first summary judgment motion, however, the court granted summary adjudication of the exclusive dealing claim. Subsequently, respondent moved for summary adjudication of the remaining causes of action. The court granted that motion and entered judgment for respondent.[5]

Appellant filed a timely notice of appeal.

## DISCUSSION

A. *Statutory Background and the Trial Court's Rulings*

■ "The Cartwright Act prohibits combinations in restraint of trade. [Citations.] Although the statutory language is all-encompassing, the courts have limited the Cartwright Act's reach to *unreasonable* restraints." (*Morrison v. Viacom, Inc.* (1998) 66 Cal.App.4th 534, 540 [78 Cal.Rptr.2d 133], italics added.) "Certain restraints which lack redeeming virtue are conclusively presumed to be unreasonable and illegal." (*Ibid.*) The Cartwright Act has two substantive sections potentially relevant in the present case, sections 16720 (as enforced through § 16726) and 16727.

Section 16720 is primarily concerned with concerted acts by two or more persons or organizations for the purpose of restraining trade. (*Morrison v. Viacom, Inc., supra*, 66 Cal.App.4th at p. 541.) Section 16727 forbids "any person" to sell or "contract 'for the sale of goods, merchandise, machinery, supplies, commodities . . . on the condition, agreement or understanding that the . . . purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the . . . seller, where the effect . . . may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State.' " (*Morrison v. Viacom, Inc., supra*, 66 Cal.App.4th at

---

[5] Appellant's motion for judicial notice of prior writ proceedings filed in this action, *Mater Misericordiae Hospital v. Superior Court* (May 25, 2006, F049768) (summary denial order) and *UAS Management, Inc. v. Superior Court* (Mar. 16, 2007, F052160) (summary denial order), is granted.

p. 541, quoting § 16727.) As can be seen from the language of section 16727, while more specifically prohibiting exclusive dealing contracts, that section is limited to the sale of "goods, merchandise, machinery, supplies, [or] commodities." The section does not concern the sale of services and, accordingly, is not applicable in the present case. (See *Morrison v. Viacom, Inc., supra,* 66 Cal.App.4th at p. 546.)

Section 16720 is, in terms, addressed to *any* agreement "[t]o create or carry out restrictions in trade or commerce." (§ 16720, subd. (a).) In addition, subdivisions (b) through (e) of section 16720 specify various price-fixing schemes that are unlawful. (Section 16720 actually describes those agreements and combinations that constitute a "trust"; section 16726 states that, except as otherwise specified in the Cartwright Act, "every trust is unlawful, against public policy and void." The cases, however, tend to discuss section 16720 as the operative provision (see *Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 334 [7 Cal.Rptr.3d 628]; *Morrison v. Viacom, Inc., supra,* 66 Cal.App.4th at pp. 542–546), and we will follow that practice.)

Section 16720 has been held to prohibit, under some circumstances, three types of contractual arrangements alleged in this case: exclusive dealing arrangements, group boycotts, and tying arrangements. The requirements to establish a cause of action for each theory differ somewhat.

An exclusive dealing agreement is, as the name implies, one in which, for example, a seller and a buyer agree that the buyer will buy only the seller's product or that the buyer will not buy the product of one of the seller's competitors. Such a provision is often a part of a franchise agreement or a distributorship contract. In California, exclusive dealing arrangements are not deemed illegal per se but may be illegal if they unreasonably restrict competition in a particular market. (See *Fisherman's Wharf Bay Cruise Corp. v. Superior Court, supra,* 114 Cal.App.4th at p. 335.)

A group boycott can involve an agreement that a group of buyers will purchase only from a designated seller. A multiple listing service that releases information only to members of the local realtors' association, to the exclusion of nonmembers, would be classified as a group boycott for Cartwright Act purposes. (See *Marin County Bd. of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920 [130 Cal.Rptr. 1, 549 P.2d 833].) As

relevant here, an unlawful group boycott requires an express or implicit agreement among competitors to restrict commerce in some manner. (*G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256, 268 [195 Cal.Rptr. 211].)

A tying arrangement typically involves a seller with monopoly or other extensive market power in a given product, who then refuses to sell that product unless the buyer buys (or agrees not to buy from the seller's competitor) a separate product over which the seller does not have extensive independent market power. (See *Cascade Health Solutions v. PeaceHealth* (9th Cir. 2008) 515 F.3d 883, 912 et seq.) Such arrangements are unlawful unless their effect on commerce is de minimis. (*Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 542 [161 Cal.Rptr. 811].)

In addition to the three foregoing theories of liability, it has been held that any other agreement or arrangement that *unreasonably* restrains trade is unlawful. (*Corwin v. Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 854 [94 Cal.Rptr. 785, 484 P.2d 953].) From the foregoing descriptions, it can be seen that a single agreement or set of agreements can give rise to liability under several different theories in the law, and in this case, one set of agreements for exclusive preferred provider status for outpatient services forms the basis for all of appellant's theories of liability.

The trial court concluded appellant failed to establish a triable issue of fact concerning an essential element of liability under each of the foregoing Cartwright Act theories. The trial court found that the undisputed evidence established that appellant had successfully competed with respondent for a substantial and increasing share of the outpatient surgical services market. As a result, competition in the market was not substantially foreclosed and the exclusive dealing theory could not be proved. The court concluded no group boycott had been established because there was no evidence the insurers colluded with each other to deal only with respondent. The trial court held that appellant had not established an illegal tying arrangement because the exclusivity contracts in question did not require the insurers to purchase any services from respondent and did not prohibit purchase of services from appellant. Finally, the court concluded any restraint of trade that did occur was reasonable because, in essence, respondent was not shown to have used its superior bargaining position to obtain a competitive advantage that substantially foreclosed competition by appellant. We will address each of the trial court's conclusions.

B. *Specific Causes of Action*

   1. *Exclusive Dealing*

By notice of motion dated December 19, 2006, respondent sought "reconsideration" of its summary adjudication motion on the exclusive dealing theory, which motion had been denied by the court on January 10, 2006. The motion purported to be based on new evidence, attached to the notice of motion through the declaration of Noel S. Cohen, one of respondent's attorneys. The motion was not in the form required by Code of Civil Procedure section 437c and was not scheduled for hearing in accordance with the requirements of that section. Appellant properly objected to these failings both in its response and at the hearing. The trial court concluded appellant had an "opportunity" to present any relevant factual information but had not done so. It found respondent's actions had not substantially foreclosed competition between appellant and respondent; it granted the motion for summary adjudication.

Appellant contends the court was precluded from considering the new evidence presented because respondent's motion failed to comply with Code of Civil Procedure section 437c. Respondent contends it was entitled to elect whether to present the motion as one for reconsideration under Code of Civil Procedure section 1008 or as a new summary judgment motion under Code of Civil Procedure section 437c, subdivision (f)(2).

■ In general, a party may move for reconsideration of a motion within 10 days after the motion is denied, based upon "new or different facts, circumstances, or law." (Code Civ. Proc., § 1008, subd. (a).) In addition, after expiration of the 10-day period to move for reconsideration, a party "may make a subsequent application for the same order upon new or different facts, circumstances, or law." (Code Civ. Proc., § 1008, subd. (b).) Such a motion does not seek reconsideration of the earlier motion but, instead, is simply a new motion that is permitted by the existence of new law or facts—in effect, it renews the earlier motion by submission of a new motion raising the same issues. The overriding purpose of Code of Civil Procedure section 1008 is to prevent duplicative motions. (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1106 [29 Cal.Rptr.3d 249, 112 P.3d 636].) The renewed motion for summary judgment on the exclusive dealing cause of action necessarily—because brought more than 10 days after the original motion was denied—was a new motion under Code of Civil Procedure section 1008, subdivision (b), renewing the earlier summary adjudication motion on the same grounds, and was not a motion for reconsideration.

Code of Civil Procedure section 437c, applicable only to summary judgment and summary adjudication motions, also prohibits duplicative motions.

Code of Civil Procedure section 437c, subdivision (f)(2) states, in part: "[A] party may not move for summary judgment based on issues asserted in a prior motion for summary adjudication and denied by the court, unless that party establishes to the satisfaction of the court, newly discovered facts or circumstances or a change of law supporting the issues reasserted in the summary judgment motion." Such a motion is a new summary judgment motion. (See *Patterson v. Sacramento City Unified School Dist.* (2007) 155 Cal.App.4th 821, 827 [66 Cal.Rptr.3d 337].)

■ Under both Code of Civil Procedure sections 1008, subdivision (b), and 437c, subdivision (f)(2), the motion made more than 10 days after an original motion is a *new* motion. Both sections authorize the new motion under prescribed circumstances but Code of Civil Procedure section 1008, subdivision (b) does not purport to authorize a new *summary judgment* motion that does not comply with the requirements for such motions set out in Code of Civil Procedure section 437c.

Motions for summary judgment may be brought only under Code of Civil Procedure section 437c and in accordance with its requirements. Respondent's renewed motion for summary judgment did not comply with Code of Civil Procedure section 437c in any way, and respondent contended it did not have to. For reasons set forth above, we conclude the motion was required to provide 75 days' notice and to be supported by a separate statement of undisputed material facts, as required by Code of Civil Procedure section 437c, subdivisions (a) and (b). The court was without authority to shorten the minimum notice for the motion over appellant's objection. (*McMahon v. Superior Court* (2003) 106 Cal.App.4th 112, 115 [130 Cal.Rptr.2d 407].)

To the extent the judgment is based upon the court's grant of summary adjudication of the first cause of action, the judgment must be reversed.

### 2. *Tying Arrangement*

Appellant contends the trial court erred in granting summary adjudication of its second cause of action, which alleged respondent used its monopoly power in the inpatient hospital services market to unlawfully coerce patients and insurers into using its nonmonopoly outpatient surgery services. We will first, and briefly, summarize the law in this area, then describe the uncontroverted facts, and conclude with an analysis of the trial court's determination.

■ It is unlawful under California's Cartwright Act, as relevant here, for a seller to use its market power in one market to force or coerce a buyer to purchase its product or service in a distinct market in which the seller does not have such market power or to refrain from buying from the seller's

competitor. The result of such coercion is called a tying arrangement, in which the market controlled by the seller consists of sales of the "tying" product or service, and the market over which derivative power is exercised consists of sales of the "tied" product or service. Where such an arrangement is found, it is illegal per se; that is, the seller's justifications for the arrangement are not measured by a rule of reasonableness. (See *Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc., supra*, 101 Cal.App.3d at p. 542.)

Although unlawful tying arrangements are prohibited under the general language of section 16720, the specific elements of an unlawful tying cause of action have been stated as follows: "(1) a tying agreement, arrangement or condition . . . whereby the sale of the tying product [or service] was linked to the sale of the tied product or service; (2) the party had sufficient economic power in the tying market to coerce the purchase of the tied product; (3) a substantial amount of sale was effected in the tied product; and (4) the complaining party sustained pecuniary loss as a consequence of the unlawful act." (*Classen v. Weller* (1983) 145 Cal.App.3d 27, 37–38 [192 Cal.Rptr. 914]; see also *Morrison v. Viacom, Inc., supra*, 66 Cal.App.4th at pp. 541–542.)

It was stipulated in the present case that in the relevant geographic market respondent was the sole provider of inpatient hospital services and was therefore deemed to have monopoly power over those services. Those services were sold, as relevant here, to insured patients through their health insurance companies.

When appellant began offering outpatient surgery services within the geographic market, respondent refused to sell inpatient services to patients' health insurance companies unless the companies established respondent as the exclusive preferred, or "in-network," provider of outpatient surgery services. The court described the benefits of being a network provider as "significant." It noted that health plans "are designed and set up to use network providers. Network providers receive increased volume [of business] and are assured payment at a pre-negotiated rate, which is generally higher than rates payable to a non-network provider." Network providers are able to estimate costs based on the prenegotiated rates. Requirements for prior authorization reviews and other barriers "make it more difficult to use a non-network provider."

Nevertheless, although disadvantaged in the manner summarized, appellant was able to sell its services to persons insured by the various plans. In particular, preferred provider status does not prohibit doctors from securing privileges and conducting surgery at nonpreferred facilities nor, in the case of

most of the insurance plans, are patients required to receive outpatient surgery services only at preferred facilities. (A few of the plans do not permit use of nonpreferred facilities, but appellant acknowledges that this results from a marketing choice by the insurer and not from any demand made by respondent. In other words, nothing in the preferred provider contract prevented those insurers from allowing out-of-network services.)

The trial court determined that appellant failed to raise as a triable issue of fact that respondent required or otherwise coerced the insurers to agree not to purchase outpatient surgical services from nonpreferred providers.[6] The court recognized that, as appellant contended, the "marketplace culture" might lead insurers to forgo the use of nonpreferred providers, but concluded there was no evidence respondent used its economic power to cause this result. The court also noted there was no evidence that respondent retaliated or threatened to do so when insurers used appellant's outpatient surgery center. The court concluded that the cumbersome nature of out-of-network services placed appellant at a competitive disadvantage, and may have cost patients more in out-of-pocket costs and limited their choices of provider, but concluded that "every exclusive dealing agreement creates these same consequences to some degree. The agreement is not necessarily unlawful."

The trial court erred in focusing solely upon the resulting agreement between respondent and the insurers. We agree with the court's conclusion that the present type of exclusive-provider arrangement "is not necessarily unlawful": If the agreement had resulted from competition between appellant and respondent, each offering a package of services and pricing to the insurers (even if the package required exclusivity as one of its terms), and even if all of the insurers in the market had chosen respondent's package, cutting appellant out of the preferred provider market completely, the result would not necessarily have been unlawful. The point, for antitrust purposes, however, is that the arrangement did not result from competition focused on the relevant market, outpatient surgery services; it resulted instead from respondent's exercise of its monopoly power in a different market, inpatient hospital services, which the insurers simply had to have in order to function in the geographic market. (*Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 184 [91 Cal.Rptr.2d 534].)

---

[6] Respondent contends the contracts in this case did not "require" the insurers to purchase any services at all from respondent; the contracts merely provided a "price list" that "permitted" the insurers to buy services at a set price. Because we conclude the contract expressly limited appellant's ability to compete in the relevant market, we need not consider here the obvious, but implicit, fact that the insurers had to buy outpatient surgery from *somewhere* in order to offer an acceptable product to insured persons. Such circumstances may or may not constitute a "coerced" purchase of the tied product, and we need not resolve that question on the present facts.

The trial court apparently concluded that the degree of impairment of the insurers in purchasing services from appellant was not sufficiently burdensome to constitute a restraint on trade. The court wrote: "Granted, the benefit may not be as great or [may be] more cumbersome to utilize when compared to a network provider benefit, however this does not rise to the level of an agreement not to provide outpatient surgical services to another provider. There is no evidence of any agreement or requirement that the health plan/insurers agree not to utilize UAS as a non-network provider."

■ The uncontradicted evidence in this case is that the insurers each *expressly* agreed with respondent that they would not "contract" for any other outpatient surgery services than those available through respondent. While it is true that the insurers could, if they chose, and did, in some cases, pay a portion of the cost for outpatient services at appellant's facility, the restriction in their provider agreement with respondent meant the insurers could not negotiate with appellant the full package of services that would have been the subject of a provider agreement. At a minimum, such a package would include a fee schedule, a fixed copayment schedule, a preapproval mechanism, and a routine billing mechanism. Whether the preferred provider contract is viewed as a sale of services on a "wholesale" basis or as something akin to a collective purchase of services by all insureds of a particular health insurer, the package of services is undoubtedly desirable *as a package*. The value of this package is more than de minimis and contracts for the package are totally foreclosed by the exclusivity contracts. This is a sufficient volume of sales to satisfy the requirement that a tying claim establish that " 'a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie . . . .' " (*Fortner Enterprises v. U. S. Steel* (1969) 394 U.S. 495, 501 [22 L.Ed.2d 495, 89 S.Ct. 1252], quoted in *Freeman v. San Diego Assn. of Realtors, supra*, 77 Cal.App.4th at p. 184.)

The trial court erred in summarily adjudicating the second cause of action in favor of respondent.

3.–5.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *The Confidential Record in this Case**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 357.

## DISPOSITION

The judgment is reversed except that the grant of summary adjudication on appellant's fifth and sixth causes of action is affirmed. The matter is remanded for further proceedings on the first, second, third, and fourth causes of action, and for further proceedings concerning the confidential status of the record, consistent with this opinion. Appellant is awarded costs on appeal.

Gomes, J., and Kane, J., concurred.

A petition for a rehearing was denied January 13, 2009, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied March 25, 2009, S170059.