Filed 2/22/16  Healthcare Reimbursement Advisors v. Cedars-Sinai Medical Center CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HEALTHCARE REIMBURSEMENT ADVISORS, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CEDARS-SINAI MEDICAL CENTER, INC., <br><br> Defendant and Respondent. | B260680 <br><br> (Los Angeles County Super. Ct. No. BC532067) |

APPEAL from judgment of the Superior Court of Los Angeles County, Barbara A. Meiers, Judge.  Affirmed.

Law Offices of Barry K. Rothman, Barry K. Rothman and Lawrence M. Boesch for Plaintiff and Appellant.

McDermott Will & Emery, Russell Hayman, Charles E. Weir and Kate M. Hammond for Defendant and Respondent.

_____

# INTRODUCTION

Plaintiff Healthcare Reimbursement Advisors, Inc. (HRA) appeals from a judgment of dismissal entered in favor of Defendant Cedars-Sinai Medical Center, Inc. (Cedars-Sinai) after the trial court sustained Cedars-Sinai's demurrer to HRA's second amended complaint without leave to amend. We affirm.

HRA describes itself as a for-profit consulting firm that "helps hospitals and other healthcare providers maximize reimbursement revenue from Medicare and Medicaid by helping them navigate the complex bureaucratic web of billing procedures." Cedars-Sinai is a nonprofit hospital and medical center with facilities in Los Angeles, California. Prior to HRA delivering a presentation to Cedars-Sinai regarding a plan to increase its Medicare reimbursements, HRA alleges Cedars-Sinai's representatives orally agreed that "[i]f Cedars-Sinai were to adopt, implement, use or employ [a] plan for seeking [increased reimbursements] using the modified method proposed by HRA, it would do so through [HRA] exclusively." In its demurrer to HRA's sole claim for declaratory relief, Cedars-Sinai argued the alleged oral agreement, which lacked terms concerning the price, duration and scope of HRA's proposed services, was too vague and indefinite to support a claim for declaratory relief. We agree, and affirm on this basis.

# FACTUAL BACKGROUND

Because this matter comes to us on demurrer, our statement of facts is based upon the allegations of Plaintiff's operative second amended complaint. (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 885.) "[W]e treat as true all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (*Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 178, fn. 3.)

Medicare is a federal health insurance program that reimburses hospitals for qualified medical services delivered to senior citizens and certain disabled persons. HRA alleges it has developed a "modified method" to qualify hospitals like Cedars-Sinai for special classification statuses under Medicare and thereby increase such hospitals' reimbursement payments. The modified method involves the submission of "various applications . . . to regulators in a particular way, at particular times, and in a particular

2

order" so as to qualify the hospital for a special status classification in cases where the hospital would otherwise not meet the "normal criteria to qualify for the status." HRA is one of "only a handful of [reimbursement consulting firms] [with] knowledge of the modified method of attaining special status." It has always taken "reasonable steps" to maintain the modified method's confidentiality, and its "enforced official policy" is to refrain from revealing its "methods, research, processes and other strategies to any prospective customer . . . without first gaining assurances of confidentiality, nondisclosure and forebearance [*sic*]."

According to the operative second amended complaint, "[b]eginning in or about mid-2010, prior to meeting with Cedars-Sinai, HRA reviewed Cedars-Sinai's cost reports and spent dozens of hours researching potential Medicare special status for Cedars-Sinai." Thereafter, HRA began advertising its consulting services to Cedars-Sinai in an effort to obtain the hospital as a client. Cedars-Sinai agreed to a meeting in June 2011. In advance of the meeting, HRA created a "20-slide visual presentation and a bound, 137-page special status plan" for Cedars-Sinai.

Before disclosing the presentation materials, HRA asked Cedars-Sinai to enter a written nondisclosure agreement and to "bind [Cedars-Sinai] to hiring [HRA] for the work if it decided to try the modified method for special status in its future applications for Medicare reimbursements." Cedars-Sinai declined to enter into a written agreement. Its reimbursement manager nevertheless assured HRA, " 'We're ethical. We will keep your plan confidential. If we decide to do it, we'll do it with you.' " HRA maintains this exchange "formed an oral agreement" pursuant to which HRA agreed to "make the Presentation" and Cedars-Sinai agreed "a) to keep the Presentation confidential among its officers and managers exclusively, b) to refrain from disclosing it or any part of it to anyone other than a Cedars-Sinai officer or manager . . . , and c) to forebear from hiring any other company but HRA to represent and advise it on the certain modified method for Medicare special status that HRA was presenting."

3

In reliance on Cedars-Sinai's assurances, HRA proceeded with its presentation on the modified method. The complaint highlights a "slide in the visual part of the Presentation," which HRA alleges "spelled out" the terms of the parties' agreement "specifically and in detail." That slide, which HRA attached as an exhibit to its complaint, states in relevant part: "*Cedars-Sinai is under no obligation to implement the strategies that we discuss today. [¶] If Cedars does decide to proceed with these strategies, it is expected that it will retain [HRA] to provide the professional services necessary for implementation pursuant to the terms of our CONSULTING AGREEMENT.*"

During the presentation, Cedars-Sinai's director of budget and reimbursement reiterated the earlier assurances to "keep the information confidential and to engage HRA as a consultant if [Cedars-Sinai] ever were to use their method for seeking Medicare reimbursements." Cedars-Sinai's vice president of finance heard these oral assurances and allowed the presentation to continue without objection or reservation.

The presentation outlined "three options to increase Medicare revenues" for Cedars-Sinai. HRA "proposed to guide Cedars-Sinai through the process of applying for special status through three (3) applications for three different statuses, in a set and timely manner, including balancing the sequence and timing of each approval." This process "implied filing with the correct Medicare agency, in the correct format, with the correct document information, in certain time frames and with matching criteria."

After the presentation, a Cedars-Sinai executive indicated he was interested in pursuing one of HRA's modified methods. The executive said Cedars-Sinai would evaluate the three methods presented and inform HRA of its decision. In reliance on Cedars-Sinai's alleged "representations or promises" concerning confidentiality and forbearance, HRA gave Cedars-Sinai a copy of the "137-page special status plan" to review.

On July 5, 2011, Cedars-Sinai's Reimbursement Manager informed HRA that the hospital had "decided not to implement any of HRA's modified methods for 'political and public' reasons." In response, HRA asked Cedars-Sinai to return the written special status plan. Cedars-Sinai returned the materials.

In May 2013, HRA's president learned that Cedars-Sinai had "entered into an agreement with a rival consulting firm to implement the modified method of seeking special status in their applications for Medicare reimbursement that HRA had presented in its Presentation." In response to inquiries from HRA, Cedars-Sinai stated that it was "not proceeding with a reclassification project at this time" and denied that it had entered into the alleged oral confidentiality, nondisclosure and forbearance agreement with HRA. With respect to the June 2011 meeting, Cedars-Sinai added that "[t]he general discussion between Cedars-Sinai and HRA did not involve [the] provision of any unique proprietary information"; the discussion related to "a published federal regulation well known to the hospital industry"; there were "many healthcare consultants and healthcare attorneys [who] are familiar with and provide consulting/advisement services related to hospital reclassification under this regulation"; and "[a]s early as May of 2011 (prior to meeting with HRA), Cedars-Sinai had already been in discussions about the reclassification matter with other consultants."

## PROCEDURAL HISTORY

HRA filed the instant action on January 2, 2014. Its initial complaint and subsequent first and second amended complaints all assert a single cause of action for declaratory relief.

Cedars-Sinai responded to each complaint with a general demurrer. In its demurrers to the initial and first amended complaints, Cedars-Sinai argued there was no present controversy concerning the confidentiality and nondisclosure aspects of the alleged agreement because the hospital had no intention of disclosing HRA's confidential information. In that regard, Cedars-Sinai pointed to the admitted fact that it had returned HRA's presentation materials upon request. As for the forbearance aspect, Cedars-Sinai

5

argued the terms of the supposed agreement were too indefinite to support a declaratory relief claim and, at most, HRA had alleged an unenforceable agreement to agree.

The trial court sustained Cedars-Sinai's demurrers to the initial and first amended complaint with leave to amend. In each instance, the court concluded the complaint had not set forth the essential terms of the purported agreement, much less the rights and obligations HRA sought to have declared under the agreement. Both orders granting leave to amend directed HRA to specify "the precise terms" of the parties' alleged agreement and the "intended or agreed upon meaning" that HRA relied upon in seeking declaratory relief.

HRA's operative second amended complaint sought to address the court's concerns by quoting the statements made by Cedars-Sinai's representatives at the June 2011 meeting and emphasizing that the alleged controversy principally related to the forbearance aspect of the purported agreement. HRA asserted a "judicial declaration is necessary and appropriate . . . in that [Cedars-Sinai] contends . . . that obliging itself to the terms of confidentiality and nondisclosure alone would fulfill its obligations . . . [while] [HRA] contends to the contrary that defendant Cedars-Sinai's forebearance [*sic*] from hiring any other consultant to use the modified methods in the Presentation was integral to their agreement and cannot be severed from its other parts." As for the precise terms of the agreement, the second amended complaint stated: "The forebearance [*sic*] aspect of the parties' agreement entailed Cedars-Sinai binding itself to these promises: [¶] A. If Cedars-Sinai were to adopt, implement use or employ [a] plan for seeking special status, using the modified method proposed by HRA, it would do so through [HRA] exclusively; and [¶] B. Cedars-Sinai would forebear from hiring a Medicare reimbursement advisory group other than HRA if it were to implement a modified method for seeking special status like that in HRA's proposal."

Cedars-Sinai again responded with a general demurrer, arguing the purported forbearance agreement was, at most, an unenforceable agreement to agree. The hospital maintained the alleged oral representations that preceded HRA's presentation contained nothing about the "material terms under which Cedars-Sinai would 'retain' [HRA]." The lack of definite terms, Cedars-Sinai argued, was only reinforced by the slide HRA attached as Exhibit A to its complaint. Not only did the slide refer to a separate consulting agreement that HRA conceded had never been presented to Cedars-Sinai, but the slide also belied the existence of a definite forbearance agreement insofar as it stated "*[i]f Cedars does decide to proceed with these strategies, it is* _expected_ *that it will retain [HRA] to provide the professional services necessary for implementation pursuant to the terms of our CONSULTING AGREEMENT*." (Underscoring added.) Absent a meeting of the minds on the terms of the consulting agreement, Cedars-Sinai argued the purported agreement to " 'utilize' [HRA] if [Cedars-Sinai] decided to proceed with reclassification" was too indefinite to support a claim for declaratory relief.

The trial court sustained the demurrer without leave to amend. Citing, among other things, the lack of specific terms concerning the parties' alleged agreement, the indefinite nature of the forbearance language in Exhibit A, and the fact that HRA had had three opportunities to clearly state a viable claim for declaratory relief, the court concluded granting further leave to amend would be futile.

## DISCUSSION

1. *Standard of Review*

"When the trial court sustains a demurrer, we review the complaint de novo to determine whether it alleges facts stating a cause of action on any possible legal theory. [Citation.] ' " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' " [Citations.]' [Citation.] 'Further, "we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." [Citations.]' " (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1490.)

"The plaintiff has the burden of showing that the facts pleaded are sufficient to establish every element of the cause of action and overcoming all of the legal grounds on which the trial court sustained the demurrer, and if the defendant negates any essential element, we will affirm the order sustaining the demurrer as to the cause of action. [Citation.]  We will affirm if there is any ground on which the demurrer can properly be sustained, whether or not the trial court relied on proper grounds or the defendant asserted a proper ground in the trial court proceedings.  [Citation.]"  (*Martin v. Bridgeport Community Assn., Inc*. (2009) 173 Cal.App.4th 1024, 1031.)

"When a demurrer is sustained without leave to amend, we also must decide whether there is a reasonable possibility that the defect can be cured by amendment." (*Koszdin v. State Comp. Ins. Fund* (2010) 186 Cal.App.4th 480, 487.)  "The plaintiff bears the burden of proving there is a reasonable possibility of amendment. [Citation.] . . . [¶]  To satisfy that burden on appeal, a plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.'  [Citation.]  The assertion of an abstract right to amend does not satisfy this burden.  [Citation.]  The plaintiff must clearly and specifically set forth the 'applicable substantive law' [citation] and the legal basis for amendment, i.e., the elements of the cause of action and authority for it.  Further, the plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action. [Citations.]  Allegations must be factual and specific, not vague or conclusionary. [Citation.]"  (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43-44.)

2.  *The Terms of the Alleged Forbearance Agreement Are Too Indefinite to Support a Claim for Declaratory Relief*

Code of Civil Procedure section 1060 provides that "[a]ny person interested . . . under a contract . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the . . . contract."  The statute thus

establishes two essential elements that must be present to state a claim for declaratory relief on a contract:  (1) a legally binding contract that is a proper subject for declaratory relief; and (2) an actual controversy involving justiciable questions relating to the contacting parties' rights and obligations.  (See *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582 (*Wilson*); *Internat. etc. Teamsters v. Bekins etc. Co*. (1955) 135 Cal.App.2d 692, 697 (*Bekins*).)  With regard to the first element, "[a]n action for declaratory relief will not lie when a complaint alleges no facts showing an enforceable contractual right in the plaintiff." (*Bekins,* at p. 697; *Dynamic Ind. Co. v. City of Long Beach* (1958) 159 Cal.App.2d 294, 300.)  As for the second, an " 'actual controversy' " is one that " 'encompasses a *probable* future controversy relating to the legal rights and duties of the parties.' " (*Wilson,* at p. 1582.)  The declaratory relief statute "does not embrace controversies that are 'conjectural, anticipated to occur in the future, or an attempt to obtain an advisory opinion from the court.' " (*Ibid.*)

In the instant action, the operative second amended complaint admits that the only actual controversy presently existing between the parties concerns the forbearance aspect of the alleged agreement.  That is, in view of Cedars-Sinai's repeated representations in the underlying judicial proceeding that it had no intention of disclosing HRA's confidential information, the complaint alleges a "judicial declaration is necessary and appropriate" only insofar as "[Cedars-Sinai] contends . . . that obliging itself to the terms of confidentiality and nondisclosure alone would fulfill its obligations . . . [while] [HRA] contends to the contrary that defendant Cedars-Sinai's forebearance [*sic*] from hiring any other consultant to use the modified methods in the Presentation was integral to their agreement and cannot be severed from its other parts."  Because no actual controversy exists with respect to confidentiality and nondisclosure, we are concerned only with whether the forbearance aspect of the alleged agreement presents a legally binding contract that is a proper subject for declaratory relief.

"Contract formation requires mutual consent, which cannot exist unless the parties 'agree upon the same thing in the same sense.' " (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208 (*Bustamante*).) " 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.' [Citations.]" (*Ibid.*) " 'Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached.' [Citation.] 'To be enforceable, a promise must be definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.' [Citations.] 'Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable.' [Citations.] 'The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.' [Citations.] But '[i]f . . . a supposed "contract" does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract.' " (*Id.* at p. 209.)

Cedars-Sinai contends the terms of the purported forbearance agreement, as expressed in the parties' alleged outward manifestations of intent, are too indefinite to create an enforceable contract. We agree. Here, the complaint's allegations concerning the terms of the purported oral agreement are limited to essentially two outward expressions of intent by the parties, neither of which supplies sufficiently definite terms to support a claim for declaratory relief.

First is the alleged oral promise by Cedars-Sinai's reimbursement manager. Before HRA gave its presentation on the "modified method," and after Cedars-Sinai rejected HRA's request for a written confidentiality and forbearance agreement, the complaint alleges Cedars-Sinai's reimbursement manager orally agreed that " 'If we

10

decide to do it, we'll do it with you.' " HRA maintains this statement amounted to an oral agreement that "[i]f Cedars-Sinai were to adopt, implement, use or employ [a] plan for seeking special status, using the modified method proposed by HRA, it would do so through [HRA] exclusively." That, to be sure, is a significant leap to make from such a brief statement in the alleged context. Be that as it may, even if we presume that deciding " 'to do it' " referred to "using the modified method proposed by HRA," there still is nothing from which a court could determine or declare the material terms of the purported agreement to "do so through [HRA] exclusively." That is, there is nothing in the alleged statement that speaks to the price or scope of the consulting services, among other things, that HRA would perform for Cedars-Sinai in the event it determined to "us[e] the modified method." Indeed, Cedars-Sinai's reimbursement manager could not have had any notion of what these material terms might be since, at the time he made the statement, HRA had yet to give the presentation on its proposed consulting services.[1]

The only other relevant allegations merely underscore the point. During the presentation, HRA displayed a slide that it claims "spelled out" the terms of the parties' agreement "specifically and in detail." But far from expressly setting forth definite terms for Cedars-Sinai's forbearance and HRA's consulting services, the slide stated, in equivocal fashion, "*If Cedars does decide to proceed with these strategies, it is <u>expected</u> that it will retain [HRA] to provide the professional services necessary for implementation pursuant to the terms of our CONSULTING AGREEMENT*." (Underscoring added.) As the trial court astutely observed, HRA's statement that it only "*expected*" Cedars-Sinai to retain it could hardly have conveyed to the hospital that it

---

[1] Moreover, the alleged statement does not answer how long Cedars-Sinai is bound to use only HRA or to define the scope of the supposed forbearance. This is critical, for as Cedars-Sinai rightly points out, HRA's " 'plan for seeking special status' involves the interpretation and use of publicly available regulations." We agree with Cedars-Sinai on this account—it strains credulity to believe that by stating, "If we decide to do it, we'll do it with you," Cedars-Sinai could have intended to "preclude[ ] [itself] from using publicly available regulations unless it contract[ed] with [HRA]," in exchange for simply "listening to a sales pitch."

11

would be absolutely bound to forbear from retaining any other of the handful of consultants with expertise in this area of Medicare regulations merely by allowing the presentation to continue. What is more, the slide's reference to the terms of a separate consulting agreement again highlights the inchoate nature of the parties' supposed agreement and demonstrates that, at best, the parties had no more than an unenforceable agreement to agree. (See *Bustamante, supra,* 141 Cal.App.4th at p. 213 ["an 'agreement to agree,' . . . is unenforceable under California law. '[T]here is no contract where the objective manifestations of intent demonstrate that the parties chose not to bind themselves until a subsequent agreement [was] made' "].)

Tacitly conceding the indefinite nature of the alleged agreement to " 'do it with you,' " HRA argues on appeal that its allegations are sufficient to prove the parties entered into an enforceable "agreement to negotiate." HRA contends the only "term missing is the exact price for the work, if HRA were to be retained," and the absence of this term is not fatal to its cause of action because "[o]ne of the terms of a contract has to be left open, in order for there to be any negotiation left to do." We are not convinced. While HRA relies on *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251 for the proposition that "a contract to negotiate an agreement is distinguishable from a so-called 'agreement to agree' and can be formed and breached just like any other contract" (*id.* at p. 1253), *Copeland* also critically held that "the appropriate remedy for breach of a contract to negotiate is *not* damages for the injured party's lost expectations under the prospective contract but damages caused by the injured party's *reliance* on the agreement to negotiate" (*id.* at pp. 1260-1261, italics added). As the *Copeland* court explained, "[t]he plaintiff cannot recover for lost expectations (profits) because there is no way of knowing what the ultimate terms of the agreement would have been or even if there would have been an ultimate agreement." (*Id.* at p. 1263.)

HRA admits that all its work reviewing "Cedars-Sinai's cost reports and spen[ding] dozens of hours researching potential Medicare special status for Cedars-Sinai" was performed "*prior* to meeting with Cedars-Sinai." (Italics added.) Accordingly, even if we accept the premise that the parties' statements and actions at the meeting outwardly manifested an intent to enter a binding "agreement to negotiate," such an agreement still would not constitute a proper subject for declaratory relief on the facts alleged. HRA admits that all costs related to tailoring its "modified method" to Cedars-Sinai were incurred before meeting with the hospital and, therefore, *not* in reliance on Cedars-Sinai's supposed agreement to negotiate. HRA also admits that Cedars-Sinai was under "*no obligation*" to retain HRA as a consultant. Hence, any declaration the court might make with respect to the supposed "agreement to negotiate" would have no practical effect on the parties' future behavior—Cedars-Sinai has no obligation to contract with HRA and HRA will incur no damage from Cedars-Sinai's failure to negotiate. Under these circumstances, it was not an abuse of discretion for the trial court to reject HRA's declaratory relief claim.[2] (See *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 648 ["when resolution of the controversy over future remedies would have little practical effect in terms of altering parties' behavior, courts have considerable discretion, pursuant to Code of Civil Procedure section 1061, to deny declaratory relief because it 'is not necessary or proper at the time under all the circumstances.' "].)

---

[2] HRA argues the trial court also erred by including an award of costs for Cedars-Sinai in its judgment of dismissal, even though Cedars-Sinai did not pray for costs in its demurrer. The argument has no merit. As the prevailing party, Cedars-Sinai was entitled to costs "as a matter of right." (Code Civ. Proc., § 1032, subd. (b).)

## DISPOSITION

The judgment is affirmed.  Cedars-Sinai Medical Center, Inc. is entitled to its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


JONES, J.[*]

We concur:



EDMON, P. J.



LAVIN, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14